UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

THE MEDICAL ASSURANCE COMPANY, )
INC., )
                         )
         Plaintiff      )
                         )
           v.          )   Case No. 4:06 cv 117
                         )
MARK S. WEINBERGER, M.D., )
et al., )
                         )
         Defendants    )

OPINION AND ORDER

      This matter is before the court on the Motion to Compel
Deposition Testimony and Exclude Evidence [DE 423] filed by the
defendant, the Indiana Patient's Compensation Fund (PCF), on May
21, 2012; the Motion to Compel Production of Withheld Documents
and Exclude Evidence [DE 427] filed by PCF on May 21, 2012; the
Motion to Strike Docket Entries 423 and 425 [DE 462] filed by the
plaintiff, Medical Assurance, on July 16, 2012; the Motion to
Strike Docket Entries 427 and 428 [DE 467] filed by Medical
Assurance on July 16, 2012; and the Motion to Strike Docket
Entries 465 and 466 [DE 494] filed by Medical Assurance on
September 6, 2012.

      For the reasons set forth below, the Motion to Compel
Deposition Testimony and Exclude Evidence [DE 423] is **GRANTED IN
PART** and **DENIED IN PART**; the Motion to Compel Production of With-
held Documents and Exclude Evidence [DE 427] is **GRANTED** with

respect to the issues the parties identified as remaining in dispute and **DENIED AS MOOT** with respect to the remaining issues; and the Motion to Strike Docket Entries 423 and 425 [DE 462], the Motion to Strike Docket Entries 427 and 428 [DE 467], and the Motion to Strike Docket Entries 465 and 466 (DE 494] are **DENIED.**

<u>Background</u>

This matter arises from a contract dispute concerning liability for approximately 353 pending medical malpractice claims against Dr. Mark S. Weinberger and the business entities he owned (the Weinberger defendants). At the time the case was filed, Weinberger could not be located but subsequently was found and arrested on federal criminal charges.

Medical Assurance seeks a declaratory judgment that it does not owe a duty to indemnify or defend the Weinberger defendants in the underlying malpractice cases because Weinberger did not participate in his defense as required by the insurance policy. To succeed, Medical Assurance is required to demonstrate that it was prejudiced by Weinberger's disappearance and lack of coopera- tion, in part due to the pending criminal charges.

On January 13, 2011, Medical Assurance filed a motion for summary judgment. Some of the medical malpractice defendants, the Verhoeve defendants, filed a motion for summary judgment regarding the aggregate limits of the underlying insurance

2

policies the following June, and another defendant, PCF, filed a motion for partial summary judgment on August 3, 2011. Due to extensions and discovery disputes, the motions were dismissed pending completion of discovery.

After the court resolved a series of discovery disputes, PCF filed the present motions, asking the court to compel a variety of discovery responses. The court held a status conference on November 30, 2012, at which the parties informed the court they would attempt to resolve some of the disputes independently. On December 21, 2012, the parties notified the court that they remained in disagreement over certain questions posed at the deposition of David Walton, a claims specialist employed by Medical Assurance. Weinberger and Medical Assurance objected to the discovery requests on the grounds of attorney-client and work product privileges, arguing that much of Walton's information was derived from conversations with the attorney who was representing Medical Assurance and Weinberger in the underlying malpractice suits, James Hough. The parties also dispute whether certain documents that were attached to a letter notifying Weinberger of the malpractice lawsuits are subject to production.

## Discussion

After the November 30, 2012, status conference, the parties met and conferred with regard to the pending discovery motions.

PCF agreed to withdraw its motion to compel and exclude evidence with the exception of its request to compel responses to certain questions posed to David Walton at his deposition. The court reads this as a blanket agreement to withdraw PCF's motion to exclude evidence and strike Purdy's affidavit in its entirety and portions of Walton's and Bodkin's affidavits. To the extent that PCF does not withdraw these requests, its motion both violates Local Rule 7.1 because it requests multiple forms of relief which should have been requested in separate motions, and is premature because Medical Assurance's motion for summary judgment has been stricken and Medical Assurance currently is not asserting the facts that PCF seeks to exclude. If the court were to rule on this issue at this time, it would amount to an advisory opinion. *See* **People of State of Ill. ex rel. Barra v. Archer Daniels Midland Co.**, 704 F.2d 935, 941 (7th Cir. 1983)("The term 'advisory opinion' is often just a conclusion; it is what you call a decision that does not resolve an actual case or controversy.").

Turning to PCF's motion to compel, a party may "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things." Federal Rule of Civil Procedure 26(b)(1). For discovery purposes, relevancy is

4

construed broadly to encompass "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Chavez v. DaimlerChrysler Corp.,* 206 F.R.D. 615, 619 (S.D. Ind. 2002)(*quoting* **Oppenheimer Fund, Inc. v. Sanders,** 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978)). Even when information is not directly related to the claims or defenses identified in the pleadings, the information still may be relevant to the broader subject matter at hand and meet the rule's good cause standard. *Borom v. Town of Merrillville*, 2009 WL 1617085, *1 (N.D. Ind. June 8, 2009) (*citing* **Sanyo Laser Prods., Inc. v. Arista Records, Inc.**, 214 F.R.D. 496, 502 (S.D. Ind. 2003)). *See also* **Adams v. Target,** 2001 WL 987853, *1 (S.D. Ind. July 30, 2001)("For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."); *Shapo v. Engle,* 2001 WL 629303, *2 (N.D. Ill. May 25, 2001)("Discovery is a search for the truth.").

A party may seek an order to compel discovery when an opposing party fails to respond to discovery requests or has provided evasive or incomplete responses. Federal Rule of Civil Procedure 37(a)(2)-(3). The burden "rests upon the objecting party to show why a particular discovery request is improper." *Gregg v. Local 305 IBEW*, 2009 WL 1325103, *8 (N.D. Ind. May 13,

2009)(*citing* **Kodish v. Oakbrook Terrace Fire Protection Dist.**, 235 F.R.D. 447, 449-50 (N.D. Ill. 2006)); **McGrath v. Everest Nat. Ins. Co.**, 2009 WL 1325405, *3 (N.D. Ind. May 13, 2009)(internal citations omitted); **Carlson Restaurants Worldwide, Inc. v. Hammond Professional Cleaning Services**, 2009 WL 692224, *5 (N.D. Ind. March 12, 2009)(internal citations omitted).  The objecting party must show with specificity that the request is improper. **Cunningham v. Smithkline Beecham**, 255 F.R.D. 474, 478 (N.D. Ind. 2009)(*citing* **Graham v. Casey's General Stores**, 206 F.R.D. 253, 254 (S.D. Ind. 2002)).  That burden cannot be met by "a reflexive invocation of the same baseless, often abused litany that the requested discovery is vague, ambiguous, overly broad, unduly burdensome or that it is neither relevant nor reasonably calcu-lated to lead to the discovery of admissible evidence." **Cunning-ham**, 255 F.R.D. at 478 (*citing* **Burkybile v. Mitsubishi Motors Corp.**, 2006 WL 2325506, *6 (N.D. Ill. Aug. 2, 2006))(internal quotations and citations omitted).  Rather, the court, under its broad discretion, considers "the totality of the circumstances, weighing the value of material sought against the burden of providing it, and taking into account society's interest in furthering the truth-seeking function in the particular case before the court." **Berning v. UAW Local 2209**, 242 F.R.D. 510, 512 (N.D. Ind. 2007)(*examining* **Patterson v. Avery Dennison Corp.,**

281 F.3d 676, 681 (7th Cir. 2002))(internal quotations and citations omitted).  *See also Hunt v. DaVita, Inc.*, 680 F.3d 775, 780 (7th Cir. 2012)(explaining that the district court has broad discretion in supervising discovery).

The parties dispute whether the pending discovery disputes are shielded from production by the attorney-client or work product privilege.  The attorney-client privilege is the oldest privilege, recognized by the common law, for confidential communications. *Upjohn Company v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981).  The attorney-client privilege is designed to prevent the disclosure of confidential information about a client.  *Allendale Mutual Insurance Company v. Bull Data Systems, Inc.*, 152 F.R.D. 132, 135 (N.D. Ill. 1993) (*citing United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983)). It is intended to encourage complete and honest communication between attorneys and their clients and thereby "promote broader public interests in the observance of law and the administration of justice." *Upjohn*, 449 U.S. at 389, 101 S.Ct. at 682.

When the basis of federal jurisdiction is diversity, the court applies the state law of attorney-client privilege. Federal Rule of Evidence 501.  *See Country Life Insurance Company v. St. Paul Surplus Lines Insurance Company*, 2005 WL 3690565, *4 (C.D. Ill. Jan. 31, 2005). *See also Lorenz v. Valley Forge Insurance*

***Company***, 815 F.2d 1095, 1097 (7th Cir. 1987). Indiana codified the attorney-client privilege under Indiana Code §34-46-3-1 which states in part that "[e]xcept as otherwise provided by statute, the following persons shall not be required to testify regarding the following communications: (1) Attorneys, as to confidential communication made to them in the course of their professional business, and to advice given in such cases." The attorney-client privilege "applies to all communications between the client and his attorney for the purpose of obtaining professional legal advice or [legal] aid regarding the client's rights and liabilities." ***Penn Central Corporation v. Buchanan***, 712 N.E.2d 508, 515 (Ind. App. 1999).

"The scope of the privilege should be strictly confined within the narrowest possible limits." ***Lawless,*** 709 F.2d at 485. *See also* ***Prevue Pet Products, Inc. v. Avian Adventures, Inc***., 200 F.R.D. 413, 415 (N.D. Ill. 2001); ***United States v. White***, 950 F.2d 426, 430 (7th Cir. 1991). The party seeking to establish the privilege bears the burden of proving all of the requirements for invoking the attorney-client privilege. "The claim of privilege cannot be a blanket claim; it must be made and sustained on a question-by-question or document-by-document basis." ***White,*** 950 F.3d at 430 (*citing* ***Lawless***, 709 F.2d at 487) (internal quotation omitted).

8

"The work product privilege is distinct from and broader than, the attorney-client privilege." ***Broadnax v. ABF Freight Systems, Inc.***, 1998 WL 474099, *1 (N.D. Ill. 1998).  Unlike the attorney-client privilege, the work product doctrine arises under federal law, even in a diversity case applying state substantive law. ***Dawson v. N.Y. Life Insurance Company***, 901 F.Supp. 1362, 1367 (N.D. Ill. 1995).  The work product doctrine is codified in Federal Rule of Civil Procedure 26(b)(3)(A) as follows:

> Ordinarily, a party may not discover docu-
> ments and tangible things that are prepared
> in anticipation of litigation or for trial by
> or for another party or its representative
> (including the other party's attorney, con-
> sultant, surety, indemnitor, insurer, or
> agent).  But, subject to Rule 26(b)(4), those
> materials may be discovered if:  (i) they are
> otherwise discoverable under Rule 26(b)(1);
> and (ii) the party shows that it has substan-
> tial need for the materials to prepare its
> case and cannot, without undue hardship,
> obtain their substantial equivalent by other
> means.  .  .  .  If the court orders discov-
> ery of those materials, it must protect
> against disclosure of the mental impressions,
> conclusions, opinions, or legal theories of a
> party's attorney or other representative
> concerning the litigation.

*See also* ***Boyer v. Gildea***, 257 F.R.D. 488, 490 (N.D. Ind. 2009)(applying the Rule).  To meet the qualified immunity from discovery based on Rule 26(b)(3), the materials sought must be: "(1) documents and tangible things; (2) prepared in anticipation of litigation or for trial; and (3) by or for a party or by or

for a party's representative." ***Boyer***, 257 F.R.D. at 490 (*citing*
Wright, Miller & Marcus, 8 *Federal Practice & Procedure* §2024 (3d
ed.)).

The threshold determination is whether the documents sought
to be protected were prepared in anticipation of litigation or
for trial.  ***Caremark, Inc. v. Affiliated Computer Services, Inc.***,
195 F.R.D. 610, 614 (N.D. Ill. 2000).  The test for each document
is "whether, in light of the nature of the document and the
factual situation in the particular case, the document can fairly
be said to have been prepared or obtained because of the prospect
of litigation." ***Caremark***, 195 F.R.D. at 614 (*citing* and *quoting*
***Binks Mfg. Co. v. National Presto Indus., Inc.***, 709 F.2d 1109,
1118-19 (7th Cir. 1983)).  Precedent is clear that eventual liti-
gation does not ensure protection of all materials prepared by
attorneys — the "remote prospect of future litigation" does not
suffice to bring the work product doctrine into play.  ***Binks,*** 709
F.2d at 1120.  Materials or investigative reports developed in
the ordinary course of business do not qualify as work product.
If the material or report came into existence because of the
litigation or because of an existing articulable claim likely to
lead to litigation, then the doctrine can apply.  ***Caremark***, 195
F.R.D. at 614.

With respect to insurance claims, a document generated or obtained by an insurer is entitled to the protection from discovery if the document can fairly be said to have been prepared or obtained because of the prospect of litigation and not, even though litigation already may be a prospect, because it was generated as part of the company's regular operating procedure. *See also* Charles Alan Wright & Arthur R. Miller, 8 *Federal Practice and Procedure* §2024 (1994). Claim file documents, materials that are part of a factual evaluation or investigation into an insured's claim, if created prior to a final coverage decision, are presumed to have been prepared in the ordinary and routine course of the insurer's business and not for litigation, thus they are not protected by the work-product privilege. *See **Harper v. Auto-Owners Insurance Company***, 138 F.R.D. 655, 663 (S.D. Ind. 1991). *See also **Stout v. Illinois Farmers Insurance Co.***, 150 F.R.D. 594, 599 (S.D. Ind. 1993). Furthermore, notice that an attorney has been retained, without additional proof that the insurer was doing something more than investigating and processing an insurance claim, is not enough to lead an insurer to anticipate litigation and claim the work-product privilege. ***Henderson v. Zurn Industries, Inc.***, 131 F.R.D. 560, 570-71 (S.D. Ind. 1990).

PCF took the deposition of David Walton, a Medical Assurance claims specialist who handled the Weinberger malpractice claims. Walton claims to have derived his knowledge, in part, from communications with attorney Hough, the attorney hired to represent both Medical Assurance and Weinberger in defense of the underlying claims. Medical Assurance objected to a variety of questions on the grounds of attorney-client and work product privilege.[1]  In response, PCF argued that Medical Assurance waived its privilege by bringing certain issues into dispute, but later acknowledged that the tripartite relationship between Hough, Weinberger, and Medical Assurance extended the privilege among all three parties, and that Medical Assurance could not waive the attorney-client or work product privileges on behalf of the Weinberger defendants. *Britz Fertilizers, Inc. v. Bayer*

---

[1]Walton was a licensed attorney employed as a claims specialist for Medical Assurance.  It does not appear that Medical Assurance is asserting that Walton acted in the capacity of an attorney with regard to either the attorney-client or work product privileges, but in any case, the record reflects that his work was limited to that of a claims specialist, and the court will not consider him an attorney for the purpose of applying the privileges.  *See Stout*, 150 F.R.D. at 610 ("Regarding insurance claims, to the extent that an attorney has acted as a claims adjuster, claims process supervisor, or claims investigation monitor, and not as a legal advisor, the privilege is not applicable.").  *See also Continental Casualty Company v. Marsh*, 2004 WL 42364, *2 (N.D. Ill. Jan. 6, 2004)("The public policy issue behind this result is that insurance companies, which are in the business of reviewing, processing, and adjusting claims, should not be permitted to insulate the factual findings of a claims investigation by the involvement of an attorney to perform such work.").

*Corp.*, 2009 WL 604940, *3 (E.D. Cal. 2009). *See also **Owens v. Best Beers of Bloomington, Inc.***, 648 N.E.2d 699, 703 (Ind. App. 1995). Nonetheless, PCF maintains that the following questions are not shielded from discovery by privilege and moves the court to compel Walton to respond:

> 1. Whether Weinberger has refused to speak with Walton or Mr. Hough (and whether Walton or Mr. Hough have tried to speak with Weinberger) about the following subjects since his return:
>
>> a. Panel opinions issued to date (Ex. 1, Walton Dep., p. 97 ln. 18 — p. 98 ln. 7);
>>
>> b. Whether Walton or Mr. Hough have "gone over" panel opinions with Weinberger that have been issued to date (Ex. 1, Walton Dep., p. 98 ln. 8 — p. 99 ln. 7);
>>
>> c. Whether Weinberger has refused to answer questions about his conduct in any of the cases since his return (Ex. 1, Walton Dep., p. 99 lns. 8-17);
>>
>> d. Whether Weinberger has refused to review plaintiffs' panel submissions as they are received (Ex. 1, Walton Dep., p. 155 lns. 2-17, p. 164 lns. 3-11);
>>
>> e. Whether Weinberger has refused to give Walton insight into the cases since his return (Ex. 1, Walton Dep., p. 100 lns. 8-19, p. 182 ln. 22 — p. 183 ln. 2, p. 184 lns. 16-24);

f. Whether Weinberger has pled the 5th Amendment during his conversations with Mr. Hough (Ex. 1, Walton Dep., p. 349 ln. 21 — p. 350 ln. 4); and

g. Whether Weinberger has ever lied to Walton or Mr. Hough since his return (Ex. 1, Walton Dep., p. 99 ln. 18 — p. 100 ln. 7, p. 143 ln. 16 — p. 144 ln. 9).

2. Whether Weinberger failed to evaluate the merits of factual and legal positions concerning his care of the claimants since his return (Ex. 1, Walton Dep., p. 155 ln. 18 — p. 156 ln. 5).

3. Whether Weinberger has refused to provide any assistance to Walton that Walton has requested since his return (Ex. 1, Walton Dep., p. 164 lns. 12-22).

4. Whether Weinberger has been motivated to assist Walton in the defense of the claims since his return (Ex. 1, Walton Dep., p. 165 lns. 3-17; *Compare* Dkt. 170-1, ¶17 (". . . a motivated doctor is the single most important person in the defense of a medical malpractice case.")).

5. Whether the handwriting on the EKG was Weinberger's (Walton Dep. p. 173 ln. 20 – p. 174 ln. 2).

6. Despite its claim that "without Weinberger's assistance, MA has been unable to determine what radiologic films were actually performed on each of the patients or what was discussed with the patients about what is revealed on the radiology films" (Dkt. 170-1, ¶18), Medical Assurance refused to allow Walton to testify whether, with Weinberger's assistance, it actually can make those determinations. (Ex. 1, Walton Dep., p. 175 ln. 9 — p. 176 ln. 1). It refused to let Walton say

whether Weinberger had assisted Mr. Hough "on the issue of reviewing radiologic films on the patients." (*Id.*, at p. 176 ln. 17 — p. 177 ln. 2). It also refused to let Walton say whether Weinberger had discussions with Mr. Hough about what Weinberger relayed to his patients about the radiology studies/films. (*Id.*, at p. 177 ln. 3 — p. 178 ln. 14).

7.    Despite its claim that it cannot assess the reasonableness of Weinberger's judgment of the CT scans (Dkt. 170-1), Medical Assurance refused to allow Walton to say whether Mr. Hough has discussed CT scans with Weinberger since his return. (Ex. 1, Walton Dep., p. 178 ln. 21 - p. 179 ln. 12). Walton was also instructed not to answer questions about whether Weinberger has discussed conservative treatment issues with Mr. Hough (*Id.*, at p. 179 lns. 13-18); whether Weinberger has discussed the integration of his treatment plan with Mr. Hough (*Id.*, at p. 179 ln. 19 - p. 180 ln. 10); and whether Weinberger has been reviewing CT scans since his return. (*Id.*, at p. 266 lns. 5-11, p. 343 lns. 2-8).

8.  Whether Walton had asked Weinberger if Dr. Han's allegations were in fact true. (Walton Dep. p. 345 ln. 20 - p. 346 ln. 2).

9.  Whether Walton had access to Weinberger to ask him questions about statements Weinberger made alleging he was frustrated about the inability to rebut statements made during the Boyer trial.  (Walton Dep. p. 348 ln. 1-5 - p. 349 ln. 9).

(Pltf. Br. pp. 11-14)

PCF readily admits that tripartite attorney-relationship between Medical Assurance, Hough, and the Weinberger defendants extends the attorney-client privilege among the three parties and that waiver of the privilege by one does not constitute a waiver

by the other party. *See Britz*, 2009 WL 604940 at *3. However, PCF has spent part of its brief arguing that Medical Assurance waived any claim to the attorney-client and work product privileges prior to making this concession. Because the parties are in agreement that the Weinberger defendants maintain the privilege, whether Medical Assurance waived its attorney-client privilege is irrelevant. The pending issue left for resolution is whether PCF's discovery requests do in fact fall under the attorney-client privilege.

The attorney-client privilege does not protect disclosure of the underlying facts and is not a wholesale bar. ***In re Aftermarket Filters Antitrust Litigation***, 2010 WL 4622527, *9 (N.D. Ill. Nov. 4, 2010). Not every communication between an attorney and his client is protected by the attorney-client privilege. *See e.g. **United States v. Defazio,*** 899 F.2d 626, 635 (7th Cir. 1990). The privilege is limited only to confidential communications made from a client to an attorney and to most communications from an attorney to a client that constitute legal advice. ***Defazio,*** 899 F.2d at 635. However, the attorney-client privilege is not automatically triggered when the attorney renders legal advice. ***Midwestern University v. HBO & Co.,*** 1999 WL 32928, *2 (N.D. Ill. 1999); ***Johnson v. Rauland-Borg Corp.***, 961 F.Supp. 208, 210 fn.5 (N.D. Ill. 1997) ("Legal advice, standing alone, does not auto-

matically receive protection.") (*citing* **Gen—Probe Inc. v. Amoco Corp.**, 1996 WL 264707, *4 n.10 (N.D. Ill. May 16, 1996)). "[C]ommunications from the attorney to the client should be privileged only if the statements do in fact reveal, directly or indirectly, the substance of a confidential communication by the client. **Johnson v. Rauland-Borg Corp.**, 961 F.Supp. 208, 210 n.5 (N.D. Ill. 1997) (internal quotations omitted). *See also* **Midwestern University**, 1999 WL 32928 at *2 ("When a lawyer gives legal advice to the client it does not automatically trigger the attorney-client privilege. Rather, statements which would reveal the substance of the confidential communication are protected."); **Koken v. American Patriot Insurance Agency**, 2007 WL 914251, *2 (N.D. Ill. 2007)). Examples of attorney-client communications excluded from the attorney-client privilege include communications regarding scheduling, billing, or identification. **Defazio**, 899 F.2d at 635; **Hueck v. State,** 590 N.E.2d 581, 585 (Ind. App. 1992) ("As a general rule, information regarding a client's attorney fees is not protected by the attorney-client privilege because the payment of fees is not considered a confidential communication between attorney and client."); **Schachar v. American Academy of Ophthamology, Inc.**, 106 F.R.D. 187, 192 (N.D. Ill. 1985)*. See also* 30 *Ind. Law Encyc. Witnesses* §42.

Additionally, the attorney-client privilege extends only to communications. "If a question does not address a communication, the matter is not protected by the attorney-client privilege." *Owens*, 648 N.E.2d at 704-05 (*citing Barnes v. State*, 537 N.E.2d 489, 490 (Ind. 1989)(question "Did you tell your attorney the truth about the case?" did not ask for the substance of a communication between attorney and client)). In *Owens*, Owens alleged that his former employer, through its president Robert Haak, agreed to pay him fifty percent of any money collected from a lawsuit as compensation for his assistance. After recovering an award, Owens was not paid and brought suit against his former employer. Owens sought to depose James R. Cotner, the attorney who he assisted on behalf of his employer. *Owens*, 648 N.E.2d at 701. Owens asked Haak such questions as what certain people, including Owens, did to assist him in preparing the case, whether he dis- cussed with Haak who was going to be responsible for assisting with the trial preparation, and whether he met with Haak at any other time to discuss preparation and assignment of responsibility. Owens' former employer objected to these ques- tions, among others, on the ground of attorney-client privilege. *Owens*, 648 N.E.2d at 705. The court rejected the defendant's objection, explaining that the answers to those questions were unrelated to confidential communications and that Owens should be

allowed to discover information concerning the agreement derived
from the communications and information regarding the actions
performed by individuals. *Owens*, 648 N.E.2d at 701.

Many of the questions posed to Walton do not concern commu-
nications between Weinberger or Medical Assurance and the attor-
ney they shared, and more accurately question Weinberger's con-
duct. PCF asked whether Weinberger refused to provide assistance
or answer questions about his conduct, whether his handwriting
was on an EKG, whether Weinberger assisted Hough with reviewing
radiologic film, whether Weinberger ever lied to Hough, and
whether Weinberger refused to review panel submissions. These
questions closely mimic those in *Owens,* as they seek to discover
what Weinberger did and did not do, rather than his attempts to
obtain legal advice or the substance of any communications he had
with Hough. Both in *Owens* and here, the information sought was
about who assisted in the preparation for litigation and what
role those individuals played. *Owens,* 648 N.E.2d at 705. The
*Owens* court even acknowledged that an inquiry about whether a
party told his attorney the truth about a case did not ask for
the substance of that communication*. Owens,* 648 N.E.2d at 705
(*citing Barnes*, 537 N.E.2d at 490) (question "Did you tell your
attorney the truth about the case?" did not ask for the substance
of a communication between attorney and client)). Because these

19

questions seek information about Weinberger's conduct and what role he played in the investigation rather than the content of any discussions, the court finds that Medical Assurance has not met its burden and demonstrated that the questions implicate the attorney-client privilege.

PCF also questioned whether Weinberger was motivated to assist in his defense, which would have been based on Walton's opinion from his interactions with Weinberger, rather than on Medical Assurance or Weinberger's communications with his attorney. Walton also was questioned whether he had access to Weinberger to ask whether statements Weinberger allegedly made, that he was frustrated about the inability to rebut statements made during the Boyer trial, actually were made, not whether Walton did in fact ask Weinberger or what his response was. Again, Medical Assurance has not shown that the discovery requests necessitate revealing the substance of any confidential communications between Weinberger or Medical Assurance and their shared attorney. PCF's motion is GRANTED on these requests.

Some of the proposed questions present a closer call, such as whether Weinberger ever pleaded his Fifth Amendment right to remain silent during his conversations with Hough, gave insight into the underlying malpractice cases, and evaluated the merits of the factual and legal positions of the malpractice claimants.

Although these questions touch on conversations that may have taken place, they certainly do not delve into the substance of the conversations.

If Weinberger ever pleaded his Fifth Amendment right to remain silent, it could not have been because he was seeking legal advice, but because he was refusing to respond to a question from his attorney. Communications from an attorney to the client are not subject to discovery unless they reveal the substance of conversations. Revealing whether Weinberger ever asserted his Fifth Amendment right, without stating to which questions he raised it, would not reveal the subject of any confidential communications. This question is similar to asking the attorney whether a specific party ever lied to him, in that it questions that party's conduct rather than the substance of any communications. Additionally, compelling discovery would not implicate the purpose of the attorney-client privilege, which is to encourage open and frank communications for the purposes of obtaining legal advice. *See **Cummins, Inc. v. Ace American Insurance Co.***, 2011 WL 1832813, *1 (S.D. Ind. May 2, 2011) (explaining that the purpose of the attorney-client privilege is to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice."). The very

nature of the question suggests that Weinberger may not have been revealing confidential information in pursuit of legal advice.

PCF also asked whether Walton had access to Weinberger to ask him about statements he made alleging he was frustrated about the inability to rebut statements made during the Boyer trial. The question does not ask whether the questions were in fact asked or answered, rather, it only asks whether Walton had access to Weinberger and could have asked those questions. Because the inquiry does not question the subject of any conversations between Weinberger and Hough or Walton, and is limited to Walton's accessibility to Weinberger, Medical Assurance has not demonstrated that the question concerns a communication and is subject to the attorney-client privilege.

PCF's questions concerning whether Weinberger ever refused to give insight on the underlying cases, refused to answer questions about any of his conduct, or failed to evaluate the merits of factual and legal positions concerning his care of the malpractice claimants bear on whether Weinberger assisted with the cases. These questions are generalized and do not inquire into the specific topics Weinberger and Hough addressed in their conversations. Compelling discovery of these questions would not demand revealing confidential communications. Rather, these questions concern the assistance Weinberger provided, which was

unrelated to the confidential communications between Hough and
Weinberger.  *See **Owens***, 648 N.E.2d at 701 (holding that questions
concerning the assistance provided in an underlying suit was not
subject to the attorney-client privilege).

The third type of questions PCF asked are those which
question Weinberger's assistance in the underlying malpractice
cases in relation to specific topics.  For example, PCF asked
whether Weinberger refused to go over panel decisions, whether he
reviewed radiologic films of the patients with Hough, and whether
Weinberger ever discussed CT scans, conservative treatment, or
integration of his treatment plan.  PCF also inquired whether
Walton asked Weinberger if Dr. Han's allegations were in fact
true.  Although these questions also seek to discover what role
Weinberger played, if any, in assisting with the underlying
malpractice claims, they delve into specific topics Hough and
Weinberger may not have discussed.  It is clear any communica-
tions Hough and Weinberger had on these topics were related to
defending the underlying malpractice claims and were done, if at
all, in pursuit of legal advice.  The proposed deposition ques-
tions touch on the subject of these confidential communications,
and the court will not compel responses.  In short, Walton should
provide responses to the following questions, as numbered above:

1 c, e-g, 2, 3, 4, 9.  PCF's motion is DENIED with respect to the other requests.

PCF next moves to compel discovery relating to Medical Assurance's internal communications regarding its defense and settlement of the claims.  Specifically, PCF seeks a response to the following questions:

> 1. Whether Walton's supervisor, Jan Harris, must obtain approval from Darryl Thomas (Medical Assurance's Chief Claims Officer) to make a settlement offer (which Medical Assurance acknowledges has been made in Barnes). (Ex. 1, Walton Dep., p. 225 lns. 6-25).
>
> 2. Although Walton admitted that he relays his thoughts on valuation of the claims to Harris (Ex. 1, Walton Dep., p. 226 lns. 1-10), Medical Assurance refused to allow him to answer whether Harris relays his collective thoughts about the case merits up the corporate ladder to Thomas. (*Id*. at p. 226 lns. 1-17).
>
> 3. While reviewing an entry from the privilege log (See Exhibit 8, Privilege No. 100), Walton refused to testify whether that consulting expert information he sent to Hunsberger was of the sort he typically sent to Hunsberger while Hunsberger was his supervisor (until March 2010 before Hunsberger became liaison to coverage counsel). (Ex. 1, Walton Dep., p. 245 ln. 17 - p. 246 ln. 16).
>
> (Pltf. Br. p. 16)

Medical Assurance argues that the questions intrude upon privileged information because they seek either the direct disclosure of privileged communications between Weinberger, claims person-

nel, or his defense counsel, indirect disclosure through the impressions or opinions of claims personnel, or the need to reference privileged documents.

Indiana broadly construes the attorney-client privilege when applying it to communications between an insurance company and its attorney. The privilege applies to communications between an insurance company and legal counsel concerning the investigation and validity of the insured's claim, whether an insured's loss fits within the terms of the contract, and discussions of coverage protection. The relevant inquiry is whether the attorney is acting in his capacity as an attorney or as either a provider of simple business advice or outside claims adjuster. *Cummins,* 2011 WL 1832813 at *2. However, a plethora of cases have held that no attorney-client privilege can be asserted against an insured or an assignee of an insured in its action against an insurance company with respect to materials prepared as part of the insured's defense in the underlying action. *See Glacier General Assurance Co. v. Superior Court*, 95 Cal.App.3d 836, 157 Cal.Rptr. 435 (Cal.App. 1979) ("To permit the insurer to use the attorney-client privilege to shield from its insured, communications which relate to the insurer's decision concerning settlement would be to place the insured in a secondary rather than a primary position in his relationship with the attorney, seriously

eroding the insured's ability to establish that the insurer had failed in its duty to him."). *See also* **Simpson v. Motorists Mutual Insurance Co.,** 494 F.2d 850, 855 (7th Cir. 1974), *cert. denied*, 419 U.S. 901, 95 S.Ct. 184, 42 L.Ed.2d 147 (1974) (finding that the attorney-client privilege did not attach to communication between the insurance company and its attorney as against the assignee of the insured's claims against the insurance company); **Lorenz v. Valley Forge Insurance Co.,** 1984 WL 2234 (N.D. Ind. 1984) *rev'd on other grounds*, 815 F.2d 1095 (7th Cir. 1987) (asserting the proposition that attorney-client privilege cannot be asserted with respect to materials by insurance-defense counsel appointed to the defense of an insured in action by insured against insurer)**; Athridge v. Aetna Casualty and Surety Co.,** 184 F.R.D. 200, 204 (D.D.C. 1998) (discussing the principle that "when a lawyer represented two persons and they later had a falling out and one sued the other, neither could claim the attorney-client privilege . . . . That principle had also been applied when an insurance company hired an attorney to represent its insureds. When the insured then sued the insurance company, the courts had rebuffed any attempts by the insurance company to claim the attorney-client privilege to prevent its insured access to the documents that attorney had created when she represented the insured and the insurance company's common interest in

defeating the case brought against the insured. . . . [T]he courts had applied this principle when the insured assigned whatever claim she had against the insurance company to the person who sued the insured in the first place.") (emphasis added); *Dome Petroleum Ltd. v. Employers Mutual Liability Insurance Company of Wisconsin*, 131 F.R.D. 63, 68—69 (D.N.J. 1990) (relying on Seventh Circuit's holding in *Simpson* and finding that there is no attorney-client privilege by insurer against subrogee of insured).

Despite the broad interpretation of the attorney-client privilege, Medical Assurance has failed to explain how the discovery questions fall within its protection.  The questions do not inquire about Weinberger, Walton, or any other Medical Assurance representative's communications with an attorney, nor do they seek production of documents prepared for litigation.  Rather, the questions concern the corporate structure within Medical Assurance for settling insurance claims.  Even if the structure for settling claims was derived through communications with an attorney, such business advice is exempt from the attorney-client privilege, and discovery seeking information of a business's ordinary course of operations is exempt from the work product privilege.  *Allendale*, 152 F.R.D. at 136-37, 141.  Additionally, because this case is a dispute between the insured and

insurer, Medical Assurance had the burden to show that the attorney-client privilege is applicable with respect to materials prepared as part of the insured's defense. Medical Assurance has made no effort to make such a demonstration and has failed to satisfy its burden. The court GRANTS PCF's motion to compel a response to these inquiries.

PCF next moves to compel responses to questions that it alleges will help to rebut Medical Assurance's assertions of prejudice. Specifically, PCF makes the following arguments and moves to compel responses to these questions:

> 1. Despite saying he could not fully evaluate the cases, and that he typically considers prior medical history of claimants when evaluating claims, Walton refused to answer whether "each of [the 353 claims] involves a plaintiff with a different physical history" and whether they are all "identical" in that regard. (Walton Dep. p. 115 ln. 14 - p. 116 ln. 24).

> 2. Although Walton testified that Weinberger was not "engaged in the process" of defending the cases, he refused to say what Weinberger had done (other than public knowledge) that caused him to make that assertion. (Walton Dep. p. 95 ln. 20 - p. 96 ln. 25)

(Pltf. Br. p. 19)

Medical Assurance has objected to the questions on the ground of attorney-client and work product privilege but again has failed to show how the privilege applies. Other than a broad

28

assertion that the response may be infused with information provided by counsel, Medical Assurance and the Weinberger defendants have not explained how compelling responses to these questions would necessitate revealing privileged communications. In the first question, PCF asks whether Walton agrees that each malpractice claimant would have a different physical history. This questions Walton's opinion, and although Medical Assurance states that it may impinge on conversations Walton had with Medical Assurance's attorney, Medical Assurance has not shown that this is necessarily true or why it cannot be answered without reference to any such conversations.  It appears that Walton's response would be based on his review of the claim files.

The second question seeks the basis of Walton's opinion on why he believed Weinberger was not engaged in the defense. Again, Medical Assurance has not explained why this could not be responded to based on Weinberger's conduct rather than by revealing the substance of confidential communications.  Medical Assurance has failed to satisfy its burden to show that the attorney-client privilege bars disclosures of the information sought.

Similarly, the work product privilege prohibits discovery of documents or tangible things prepared by attorneys in anticipa-

tion of litigation. Materials or investigative reports developed in the ordinary course of business do not qualify as work product. If the material or report came into existence only because of the litigation or because of an existing articulable claim likely to lead to litigation, then the doctrine may apply. *Caremark*, 195 F.R.D. at 614. Neither of PCF's requests seek production of any tangible documents, and even if they did, Medical Assurance has not explained that they demand documents prepared by an attorney or representative in anticipation of litigation, as opposed to documents prepared by Walton when he was acting in his capacity as a claims adjuster. *See Stout*, 150 F.R.D. at 610 (explaining that the attorney-client and work product privileges will not apply to an attorney acting solely in the capacity of a claims adjuster). Claim file documents, materials that are part of a factual evaluation or investigation into an insured's claim, if created prior to a final coverage decision, are presumed to have been prepared in the ordinary and routine course of the insurer's business and not for litigation, thus they are not protected by the work-product privilege. *See Harper v. Auto-Owners Insurance Company*, 138 F.R.D. 655, 663 (S.D. Ind. 1991). *See also Stout,* 150 F.R.D. at 599. Furthermore, documents prepared in anticipation of litigation are not always subject to privilege in coverage disputes between an insurer and insured.

*Lorenz*, 1984 WL 2234 at *7 ("[W]here two parties are represented by the same attorneys for their mutual benefit, the communications between the parties are not privileged in a later action between such parties or their representatives.").

The first question, whether Walton agreed that each of the malpractice plaintiffs had a different physical history, was asked in conjunction with whether he considered the medical history of the claimants when evaluating claims. This question is based on Walton's conduct in evaluating claims, not on his communications with Medical Assurance's attorney. Even if Walton discussed this matter with Medical Assurance's attorney at some point, the law is clear that the privilege does not shield the facts from discovery. *See Upjohn Co. v. United States*, 449 U.S. 383, 395, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (explaining that the attorney-client privilege does not protect the client from disclosing the facts underlying communications with his attorney). Moreover, the question seeks Walton's process in evaluating the insurance claims, particularly what he did in evaluating the insurance claims against Weinberger, and not what he prepared in anticipation of litigation. Typically, materials that are part of a factual evaluation or investigation are not subject to the work product privilege, and Medical Assurance has not demonstrated why allowing Walton to respond to this question would

require information beyond the factual evaluation or investiga-

tion.  If the question demands consulting any documents, it is

not clear that it would require a review of documents prepared in

anticipation of litigation, rather than those prepared in the

ordinary course of business evaluating the claim.  *See Caremark*,

195 F.R.D. at 614 (explaining that documents prepared in the

ordinary course of business are not subject to the work product

privilege).  Medical Assurance also carried an additional burden

to show why the privilege should apply in light of the nature of

the suit between the insured and insurer.  *See Lorenz*, 1984 WL

2234 at *7 (explaining that the attorney-client privilege cannot

be asserted with respect to materials by insurance-defense

counsel appointed to the defense of an insured in an action by

insured against insurer).  Medical Assurance has failed to over-

come any of these hurdles, and the court finds that the work

product privilege does not apply.

With regard to the second question, Medical Assurance has

committed many of the same shortcomings.  It did not explain why

responding would require revealing the substance of any communi-

cations Weinberger or Medical Assurance had with an attorney in

pursuit of legal advice, that responding would require production

of documents prepared in anticipation of litigation rather than

documents prepared in the ordinary course of business, or why the

privilege should apply in light of the nature of the suit.  Although this question more directly concerns litigation, in that it asks for the basis of Walton's opinion that Weinberger was not engaged in the defense of the malpractice claims as opposed to his opinion in evaluating claims, without showing that it can overcome the aforementioned hurdles, the privilege is inapplicable.  The question seeks Walton's opinion of Weinberger's conduct, which would be derived from his own experience with the case, not from any documents or discussions.

Next, PCF moves to compel a response to a question concerning Walton's communications with Hough on the subject of an ethical screen.  Hough testified that he did not filter any information he reported to Medical Assurance, believing that Medical Assurance knew what it could and could not do with the information it received.  Walton then testified that it was important for defense counsel to shield from him information detrimental to an insured's coverage, but then he refused to answer whether he expected that Hough would not provide him information that would adversely affect Weinberger's coverage.  PCF moves to compel a response to this question.  Additionally, PCF asks the court to compel Walton to answer whether he withheld any information he learned or obtained from Hough during his discussions with outside coverage counsel in the case.

Medical Assurance objected to PCF's question concerning the type of information Walton believed Hough would not provide him, arguing that the question calls for a legal conclusion, is protected by the attorney-client privilege, and is irrelevant. A deponent must respond unless the question is protected by privilege, violates a limitation ordered by the court, or it is asked in bad faith, or to annoy, embarrass, or oppress a party. Federal Rule of Civil Procedure 30(c)(2), (d)(3)(A). The questions PCF posed do not concern the content of any communications Walton had with Hough concerning pending litigation. Rather, they seek Walton's understanding on whether Hough was required to withhold information and whether Walton himself withheld information. The very wording of the first question makes it clear that the response would not reveal confidential communications between the two parties. Although the second question concerns whether Walton ever relayed any information he learned through his communications with Hough to outside coverage counsel, it does not seek the content of the communications and is limited strictly to Walton's conduct handling for the information. Medical Assurance has not demonstrated that compelling a response would necessitate revealing the content of any confidential communications. PCF's motion is granted with respect to these questions.

PCF also moved to compel production of certain documents. The parties have been able to agree on all requests with the exception of "Blueprint for Processing a Medical Malpractice Claim" and "Physician Information to Be Supplied to Assist Your Defense Counsel."  Walton testified that it was normal procedure for Medical Assurance to send a letter to its insured when a medical malpractice complaint was filed.  The blueprint and physician information sheet were sent as enclosures to inform the insured of the scope of his cooperation obligations.  Medical Assurance objects to providing these forms on the grounds of attorney-client and work product privilege.  In its response brief, Medical Assurance calls PCF's request "patently absurd" and argues that there is ample non-privileged information available.  However, Medical Assurance fails to show how the attorney-client or work product privilege apply.

It appears that these documents were sent to every insured who had a claim filed against it in the ordinary course of business.  Neither Medical Assurance nor Weinberger have shown that the forms were prepared in anticipation of this litigation or contain confidential communications from Weinberger in an effort to obtain legal advice.  Forms prepared in the ordinary course of business as part of the company's regular operating procedure are excluded from privilege and must be produced.  *Caremark*, 195

F.R.D. at 614. Because these forms were sent with every claim to every insured, it is readily apparent that the forms were not prepared in anticipation of litigation or outside the ordinary course of business, and Medical Assurance has done nothing to prove otherwise.  PCF's motion to compel production of these documents is **GRANTED.**

Because the parties notified the court that the above discovery remained in dispute and stipulated to have the court resolve these pending issues, the court will not address Medical Assurance's motions to strike [DE 462, 467, & 494].

————————————

Based on the foregoing, the Motion to Compel Deposition Testimony and Exclude Evidence [DE 423] filed by the defendant, the Indiana Patient's Compensation Fund (PCF), on May 21, 2012, is **GRANTED IN PART** and **DENIED IN PART;** the Motion to Compel Production of Withheld Documents and Exclude Evidence [DE 427] filed by PCF on May 21, 2012, is **GRANTED** with respect to the issues the parties identified as remaining in dispute and **DENIED AS MOOT** with respect to the remaining issues; and the Motion to Strike Docket Entries 423 and 425 [DE 462], the Motion to Strike Docket Entries 427 and 428 [DE 467] filed by the plaintiff, Medical Assurance, on July 16, 2012, and the Motion to Strike

Docket Entries 465 and 466 [DE 494] filed by Medical Assurance on September 6, 2012, are **DENIED.**

ENTERED this 7th day of February, 2013

s/ ANDREW P. RODOVICH
    United States Magistrate Judge