UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| THE MEDICAL ASSURANCE<br>COMPANY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 4:06-CV-117 JD |
| | ) | |
| MARK S. WEINBERGER, M.D., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case arises out of the spate of medical malpractice committed by Dr. Mark S.

Weinberger ("Weinberger"), who performed numerous unnecessary surgeries on his patients so

as to increase his earnings prior to fleeing the country to escape accountability for his actions.

The Medical Assurance Company, Inc. ("Medical Assurance"), Weinberger's malpractice

insurance provider, thereafter filed this action seeking declaratory judgment that it had no duty to

defend or indemnify Weinberger or his entities (collectively the "Weinberger Defendants") for

that malpractice. The defendants in this matter are Weinberger and several entities he established

to conduct his business, in addition to all of the claimants in underlying actions against the

Weinberger Defendants for malpractice, grouped into two subsets referred to as the "Verhoeve

Defendants" and the "Thomas Defendants," and the Indiana Patient Compensation Fund (the

"Fund"), which is potentially liable to the claimants for any malpractice damages beyond the

limits of or not covered by the insurance policies, pursuant to Indiana's medical malpractice

legislation. In response to Medical Assurance's complaint, the Fund filed a counterclaim seeking

a declaration that Medical Assurance owed coverage for the claims at issue up to its policy

limits. The Verhoeve Defendants also filed a counterclaim in which they seek declaration of the

amount of total aggregate limits under the applicable policies, and the Fund then filed counter/cross-claims against each of the other defendants seeking declaration that it did not owe them any amounts.

As this case presently stands, the Weinberger Defendants have defaulted, and after appointment of a Special Master to oversee and coordinate settlement discussions, settlements have been reached between some, but not all, of the parties. The parties report that the Fund has reached a settlement with all of the Thomas Defendants and Verhoeve Defendants. The Thomas Defendants have settled their claims with Medical Assurance as well, so the Thomas Defendants' interest in this matter will be concluded upon finalization of those settlements. What currently remains are the claims between the Verhoeve Defendants and Medical Assurance, and potentially claims the Fund may have against Medical Assurance relating to the resolution of the Verhoeve Defendants' claims against Medical Assurance. Although the ultimate question of whether Medical Assurance owes coverage regarding the underlying malpractice claims remains outstanding, motions for summary judgment as to the Verhoeve Defendants' counterclaim for declaratory judgment as to the aggregate policy limits are currently pending before the Court and are ripe for ruling.

Each of the four non-defaulted parties has briefed or expressed its position as to the total aggregate policy limits applicable to the underlying malpractice claims. For the following reasons, the Court GRANTS the motions for summary judgment as modified herein relative to the amount in question, and holds that the total aggregate policy limits applicable to liability arising out of Weinberger's malpractice are $5,550,000. The parties have also filed various motions relating to the consideration and resolution of the motions for summary judgment, and the Court addresses each of those in turn as well.

# I.    FACTUAL BACKGROUND

## A.    Factual History

Weinberger was an otolaryngologist, an ear, nose, and throat specialist, who practiced in Merrillville, Indiana. [DE 53 ¶ 16]. Weinberger established various legal entities through which he practiced, including Mark Weinberger, M.D., P.C. ("Weinberger, PC"), the Merrillville Center for Advanced Surgery, LLC (the "Merrillville Center"), the Nose and Sinus Center, LLC, and Subspecialty Centers of America, LLC, (collectively, the "Weinberger Entities"). [DE 170-12]. Though Weinberger was apparently a prominent physician, his practice was in fact rife with malpractice. According to a report issued by the Medical Licensing Board of Indiana, Weinberger "submitted insurance claims on numerous occasions in which he grossly over billed for procedures, billed for medically unnecessary surgeries, or billed for services not rendered." [DE 53-1 ¶ 9]. This was not merely billing fraud, but included performing surgeries on numerous patients for whom there was no medical need, apparently in order to charge the patients and their insurers for these unnecessary procedures. [DE 313 ¶¶ 10–12].

This conduct began to catch up with Weinberger in June 2004, when patients began filing Proposed Complaints for medical malpractice against him with the Indiana Department of Insurance. [DE 53 ¶ 8]. However, in September 2004, while on vacation with his family in Greece, Weinberger disappeared and went on the lam for several years. [DE 53 ¶ 16]. In the meantime, though, several hundred claims were brought against Weinberger and the Weinberger Entities on account of his malpractice. [DE 53 ¶¶ 10–12]. Medical Assurance, which insured the Weinberger Defendants, undertook the defense of these actions, but it claims to have been prejudiced by the fact that Weinberger had absconded and was not available to assist in the defense, leading to unfavorable results in the underlying malpractice actions. [DE 53 ¶¶ 27–30].

Though Weinberger has since been apprehended and sentenced to prison for his conduct, numerous actions relating to civil liability for Weinberger's conduct, including the present action, remain pending. Medical Assurance initiated this action seeking declaratory judgment that the Weinberger Defendants had breached provisions of the insurance policies requiring them to cooperate with Medical Assurance in the defense of any malpractice actions, and that Medical Assurance owed no coverage under the policies as a result. [DE 1, 53]. The Fund responded to Medical Assurance's Complaint by filing a counterclaim that seeks a declaratory judgment that Medical Assurance owes coverage to the Weinberger Defendants in the full amount covered by the applicable policies. [DE 59]. The Fund also filed cross- and counter-claims against the other defendants for declaratory judgment alleging that it is not liable to them. [DE 313].

The Verhoeve Defendants have also filed a counterclaim in which they ask "that this Court declare the total aggregate limits, per policy year, of all of the professional liability insurance policies at issue in this litigation providing coverage for all the underlying medical negligence claims identified in the Complaint." [DE 290]. The present motions for summary judgment relate to this counterclaim, and all remaining parties in this action have sought entry of summary judgment as to this claim, though they have expressed various opinions as to the correct amount of applicable aggregate policy limits. [DE 510, 523, 527, 539].

**B.** **The Insurance Policies at Issue**

The malpractice insurance policies in question were all provided by Medical Assurance, which began insuring the Weinberger Defendants in 1996. The first policy, policy number 1010294, listed Weinberger and Weinberger, PC as the insureds. [170-8 p. 20]. It ran from September 23, 1996 to September 23, 1997, and carried limits of liability of $100,000 for each medical incident and an annual aggregate limit of $300,000. [*Id.*] This policy was renewed for

the periods of September 23, 1997 to September 23, 1998; September 23, 1998 to September 23, 1999; and September 23, 1999 to September 23, 2000. [DE 170-7, -8]. The policy was amended during the third period to increase the limits of liability to $250,000 for each medical incident and $750,000 in the annual aggregate. [DE 170-7 p. 18]. This policy was then cancelled during its fourth period, effective June 1, 2000. [DE 170-7 p. 3].

On June 1, 2000, another policy, policy number MP32800, went into effect. [DE 170-6 p. 4]. This policy again insured Weinberger and Weinberger, PC for $250,000 per incident, with an annual aggregate limit of $750,000, and ran from June 1, 2000 through June 1, 2001. [*Id.*] The policy was renewed for the period from June 1, 2001 through June 1, 2002. [DE 170-5 p. 9]. During this period, the policy was amended twice, adding the Nose and Sinus Center, LLC, and the Rejuvenating Laser Spa, LLC as insureds. [DE 170-5 pp. 3, 6]. The MP32800 policy was then renewed for June 1, 2002 through June 1, 2003. [DE 170-4 p. 15]. For this period, the policy began by covering the same four insured, and was amended two more times to add Deirdre A. Durkis, M.D. as an insured physician, and Subspecialty Centers of America, LLC as an insured organization. [DE 170-4 pp. 6, 9, 15] In addition, the policy was amended effected March 18, 2003 to add $1,000,000 in additional limits of liability for Weinberger. [DE 170-4 p. 3]. This policy was again renewed for the June 1, 2003 to June 1, 2004 period, and carried the same $250,000 per-incident and $750,000 aggregate limits of liability as to each insured, as well as $1,000,000 in additional coverage for Weinberger. [DE 170-3 p. 10].

The parties entered a new policy for the period of June 1, 2004 through June 1, 2005, numbered MP50554. [DE 170-2 p. 4]. This policy again covered Weinberger, Weinberger, PC, the Nose and Sinus Center, LLC, and Subspecialty Centers of America, LLC, at the same primary limits of liability, and with the same $1,000,000 in additional limits for Weinberger. [DE

170-2 p. 4]. This policy was terminated effective October 29, 2004, though, likely due to the fact that Weinberger had absconded to Europe just prior to that time. [DE 170-1 pp. 14–22]. However, tail-reporting endorsements were added to the policy so as to provide the same levels of coverage to each of the insureds for any claims that occurred during the policy's effective dates even if they were brought after the date of termination. [*Id.*]

In addition to these policies, Medical Assurance extended several policies specifically to the Merrillville Center. Policy number HP515 ran from November 6, 2002 to November 6, 2003, and provided $250,000 in coverage for each medical incident and an annual aggregate of $750,000. [DE 170-10 p. 23]. That policy was renewed with the same levels of coverage for the period from November 6, 2003 through November 6, 2004. [DE 170-9 p. 6]. In addition, policy number HP888 ran from November 6, 2003 to November 6, 2004, and provided $1,000,000 in excess coverage to the Merrillville Center. [DE 170-10 p. 5].

## II.     PRELIMINARY MATTERS

Before turning to the substance of the pending motions for summary judgment, there are a number of preliminary issues to address.

### A.     Evidentiary Issues

Medical Assurance has moved to strike a paragraph of an affidavit offered by the Verhoeve Defendants in support of their motion for partial summary judgment [DE 546]. The paragraph states as follows:

> In all claims made against Dr. Weinberger which have gone to trial, are through the Medical Review Panel process, or are through the Submission stage, the Defendants have stipulated, admitted, or conceded that Dr. Weinberger was an agent of Mark Weinberger, M.D., P.C., Merrillville Center for Advanced Surgery, LLC; and the Nose and Sinus Center, LLC.

[DE 512-4 ¶ 4]. The Verhoeve Defendants cite this paragraph in support of their contention that Weinberger was acting as an agent of the Merrillville Center for Advanced Surgery, LLC, such

6

that Merrillville Center's policies would provide coverage for Weinberger's acts of malpractice. [DE 511 p. 9 n.16]. However, Medical Assurance asserts that this paragraph is inadmissible hearsay, and asks that it be stricken.

The Court declines to strike this paragraph as hearsay, though, because the truth of the matter asserted is not relevant to the present motions for partial summary judgment as to policy limits. Whether or not Weinberger was an agent of the Weinberger Entities and whether those entities are vicariously liable for his conduct are questions that must be resolved in the underlying malpractice actions, not in this proceeding to determine the parties' rights and obligations relative to the malpractice insurance policies. The Court therefore relies on the paragraph in question only to the extent that it establishes that the policies are at least at issue, making it appropriate at this time to determine whether they would provide coverage, and in what amount, should the entities be held liable for Weinberger's malpractice. Therefore, because the Court does not rely on the paragraph for the truth of the would-be hearsay, Medical Assurance's Motion to Strike [DE 546] is DENIED.

Medical Assurance has also moved this Court to accept a partially-redacted affidavit in support of its motion for partial summary judgment. [DE 550]. The redaction removes the name of a particular claimant with whom Medical Assurance has reached a settlement. [DE 528-12, 538-12 ¶ 5]. No party has responded to the motion, and the name of the claimant is not material to the present issues, so the Court GRANTS Medical Assurance's motion to accept the redacted affidavit. [DE 550].

**B.      Medical Assurance's Motions to Strike and Suspend Briefing**

Medical Assurance has also filed several motions pertaining to the Fund's brief in response to the motions for partial summary judgment and the relief the Fund requested. First,

Medical Assurance asks this Court to strike portions of the Fund's brief, including its request for summary judgment holding that the aggregate limits of the policies is $18,100,000, and its discussions of waiver and estoppel. [DE 547]. As to the Fund's request for summary judgment, both Medical Assurance and the Verhoeve Defendants filed motions for partial summary judgment, each requesting judgment on the same question but advancing different arguments as to how that question should be resolved. [DE 510, 511, 527. 528]. Rather than file its own motion for summary judgment, the Fund simply filed a response brief in which it argues that summary judgment should be granted but in yet a different amount. [DE 539]. Medical Assurance argues that this was procedurally improper and that the Fund should have filed its own motion for summary judgment in order to request this relief.

The Court is not persuaded by Medical Assurance's argument. The motions for partial summary judgment are properly before the Court and have been extensively briefed. Medical Assurance itself submitted four separate briefs in which it addresses the substance of these issues, [DE 528, 538, 544, 545], and both Medical Assurance and the Verhoeve Defendants even addressed the Fund's position at some length before the Fund even filed its response [DE 511, 528]. In ruling on these motions, the Court is not limited to ruling in favor of either party in the full amount sought by that party, but can grant judgment in any amount supported by undisputed facts in the record. Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party . . . ."); *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 740 (7th Cir. 2002). The fact that the Fund did not file a separate motion does not justify disregarding the arguments

it offers in support of granting judgment in a different amount, and the Court therefore DENIES Medical Assurance's motion as to this issue.[1]

Medical Assurance's motion also requested that the Court strike the Fund's arguments in its response brief as to waiver and estoppel. In its response to the motions for partial summary judgment, the Fund suggested that Medical Assurance should be estopped from challenging the amount of the coverage limits because it purportedly put its own financial interests ahead of those of the Weinberger defendants. Medical Assurance asserts that this argument should be stricken because it is premature, untimely, and/or inapplicable. In response to Medical Assurance's motion to strike, the Fund clarified that it is only requesting "that this Court ignore [Medical Assurance's] argument regarding limits and only consider the [Fund's] and Verhoeve Defendants' respective arguments." [DE 551 p. 7 n.4].

However, for similar reasons as to why the Court will not disregard the Fund's arguments, it will not disregard Medical Assurance's arguments as to the policy limits. The motions are properly before the Court (at the very least through the Verhoeve Defendants' motion), and there are no circumstances present that would justify disregarding any argument that would assist the Court in properly resolving those motions. Though the Fund is welcome to raise its arguments as to waiver and estoppel again at the appropriate time, the Court will not disregard Medical Assurance's argument as to policy limits on those grounds. Therefore, because the Court declines to grant the Fund the relief it seeks in its argument, the argument need not be stricken, so Medical Assurance's motion to strike [DE 547] is DENIED. Medical Assurance's motion in the alternative to suspend briefing on these issues [DE 549] is likewise DENIED as moot.

---

[1] For those same reasons, Medical Assurance's recent motion to dismiss [DE 572] based on its argument that the Fund no longer has standing in this action due to its settlements with the Verhoeve and Thomas defendants does not affect the Court's consideration of the present motions.

**C.      Motion for Expedited Ruling**

The parties have also filed various motions with regard to how and when the Court should rule on the present motions for summary judgment. [DE 558, 560]. In order to provide the parties time to conclude settlement negotiations with the Special Master, the Court stated that it would not rule on the present motions prior to August 1, 2013 [DE 557]. On July 3, 2013, however, the Fund and the Verhoeve Defendants moved for an expedited ruling on these issues, suggesting that this would facilitate resolution of the remaining issues. [DE 558]. Medical Assurance responded in opposition to this motion [DE 559], and further moved to strike the motion [DE 560]. However, these disputes have been mooted by the passage of time, so the joint motion for expedited ruling [DE 558] and Medical Assurance's motion to strike [DE 560] are DENIED as moot.

**D.      The Motions for Partial Summary Judgment as to Policy Limits are Ripe**

Finally, the Fund asserted in its response to the motions for summary judgment that the issue of the aggregate policy limits is not ripe, and that the Court should therefore refrain from ruling. The Fund later moved for an expedited ruling on this matter, however, and represented that it would withdraw its ripeness argument without prejudice in order to facilitate an expedited ruling.  Even though they appear ready to withdraw that argument, because the Fund's motion for expedited ruling has been denied the Court will address the ripeness argument on its merits. The Fund essentially argues that because the claimants may discover and assert liability against the Weinberger entities independent of Weinberger's malpractice, which they assert could open up additional coverage limits, the Court should not rule on the policy limits until all of the underlying claims have been resolved. Otherwise, they argue, this Court's ruling on that question

could preempt Medical Assurance's obligation to defend against or indemnify those claims, leaving the Fund to pick up the excess.

This need not, and will not, be the result of this Order, however. It is not this Court's role to determine what theories of liability the claimants can assert and against whom, as those are questions that must be resolved in the underlying malpractice actions. Rather, this Court's role is to determine the parties' rights and responsibilities relative to the policies at issue. This issue is ripe even though the underlying claims may be contingent, particularly due to Medical Assurance's continuing obligation to defend and indemnify Weinberger until it has exhausted its policy limits. *See Bankers Trust Co. v. Old Republicans Ins. Co.*, 959 F.2d 677, 680 (7th Cir. 1992); DE 289 pp. 7–14.

### III.    SUMMARY JUDGMENT STANDARD OF REVIEW

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Kerri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. On the other hand, where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in its favor. *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Finally, the fact that the parties have cross-filed for summary judgment does not change the standard of review. *M.O. v. Ind. Dep't of Educ.*, 635 F.Supp.2d 847, 850 (N.D. Ind. 2009). Cross-motions are treated separately under the standards applicable to each. *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008).

## IV.    CROSS MOTIONS FOR SUMMARY JUDGMENT

Turning to the merits, the four parties have expressed three different positions as to the total aggregate limits of the policies that are relevant to the underlying claims. Medical Assurance argues that this number is $4,650,000. It contends that eight policies are applicable here, two of which have aggregate limits of $300,000,[2] and six of which have aggregate limits of $750,000,[3] coming to $5,100,000 in maximum aggregate limits. It then reduces that amount by $200,000 to reflect two years in which the aggregate policy limits were not met,[4] and by $250,000 based on a settlement that it has already paid out. The Verhoeve Defendants concur

---

[2] The 1010294 policy for the periods of 1996 to 1997, and 1998 to 1999 (no claims have been brought from 1997 to 1998). [DE 528-9 pp. 7–8].
[3] The 1010294 policy for 1999 to 2000, each of the four MP32800 policies, and the MP50554 policy.
[4] The 1996 to 1997 and 1998 to 1999 periods under the 1010294 policy, each of which had two claims at the per-incident limit of $100,000, according to Medical Assurance.

with these calculations (though they do not incorporate the reductions in their figures), but they contend that an additional policy applies over three different policy periods, each containing an aggregate limit of $750,000,[5] and that $1,000,000 in additional coverage applies as well.[6] This amounts to a total of $8,350,000 in aggregate policy limits for these claims. The Thomas defendants joined the Verhoeve Defendants' positions in full. [DE 523].

The Fund claims to agree with these numbers as a starting point, but in actuality it disagrees with these numbers in several respects. First, while it agrees that the first policy period carried limits of $100,000 per incident,[7] it asserts that there was only one claim for that period. Second, it argues that the 1010294 policy for the 1998 to 1999 period carried a per-incident limit of $250,000, rather than $100,000, and aggregate limits of $750,000, rather than $300,000, so that the two claims during that period implicate $500,000 in coverage. Thus, it agrees with the $5,100,000 baseline only when adjusting for periods in which the aggregate limit would not be reached due to the number of claims made—the total aggregate limits for those policies per the Fund's positions would be $5,550,000. Third, the Fund does not agree that the HP515 policy applies for the 2001 to 2002 period, as the Verhoeve Defendants argue, meaning that it sees only $7,600,000 in coverage (or $8,050,000 in aggregate limits) under the limits accounted for by Verhoeve Defendants' positions. On top of those amounts, however, the Fund further asserts that each insured within each policy carries a separate limit, adding $7,500,000 to the aggregate limits,[8] and that three other excess coverage limits of $1,000,000 apply as well.[9] This comes to

---

[5] The HP515 policy to the Merrillville Center for Advanced Surgery, LLC.
[6] The Verhoeve Defendants first argue that this additional coverage comes from the MP50554 policy, but they later assert that it comes from the 2003 to 2004 period of the MP32800 policy.
[7] The 1010294 policy for the 1996 to 1997 period.
[8] Ten additional aggregate limits of $750,000—six on account of Weinberger PC and four on account of the Nose and Sinus Center.
[9] Including the one excess coverage policy the Verhoeve Defendants argue for, this comes to four policies with $1,000,000 in excess coverage limits: MP32800 for the 2002 to 2003 and 2003 to 2004 periods, the MP50554 policy, and the HP888 policy.

$18,100,000 in applicable coverage (or $18,550,000 in total aggregate limits under the policies). This Order will address each of the issues raised by these respective positions in turn.

Before turning to the policies themselves, however, it is important to note the method by which the policies should be interpreted, an issue the parties disagree on as well. In Indiana, insurance policies are governed by the same rules of construction as other contracts, and their interpretation is a question of law. *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009). When interpreting an insurance policy, the court's goal is to ascertain and enforce the parties' intent as manifested in the insurance contract. *Buckeye State Mut. Ins. Co. v. Carfield*, 914 N.E.2d 315, 318 (Ind. Ct. App. 2009), *trans. denied*. If insurance policy language is clear and unambiguous, it should be given its plain and ordinary meaning. *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E. 2d 770, 771 (Ind. 2008) (quoting *Cabanaw v. Cabanaw*, 648 N.E.2d 694, 697 (Ind. Ct. App. 1995)); *see also Sell v. United Farm Bureau Family Life Ins. Co.*, 647 N.E.2d 1129, 1132 (Ind. Ct. App. 1995). The court may not extend insurance coverage beyond that provided in the contract, nor may the court rewrite the clear and unambiguous language of the insurance contract. *Am. States Ins. v. Adair Indus.*, 576 N.E.2d 1272, 1273 (Ind. Ct. App. 1991).

As a general matter, any ambiguity in an insurance agreement is strictly construed against the insurance company to further the general purpose of providing coverage. *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992); *see also Sans v. Monticello Ins. Co.*, 676 N.E.2d 1099, 1101 (Ind. Ct. App. 1997). However, this rule does not necessarily apply in disputes between an insurer and a third party. *Ind. Lumbermens Mut. Ins. Co. v. Statesman Ins. Co.*, 291 N.E.2d 897, 899 (Ind. 1973). In *Lumbermens*, the Indiana Supreme Court analyzed an insurance policy in the context of a dispute between two insurance companies over which company's policy applied to the claim in question. *Id.* at 898. In addressing its method of interpretation, the Court stated:

[W]e are in fact in this instance not dealing with the two parties to the contract. The party claiming to be an insured in this case never paid a penny's premium to the insurer. We are therefore not in a situation where we must construe the contract language any certain way and can seek out the general intent of the contract from a neutral stance.

*Id.* at 899. However, as Indiana appellate courts have clarified, whether the claimant was a party to the policy is not dispositive. *Argonaut Ins. Co v. Jones*, 953 N.E.2d 608, 615–16 (Ind. App. 2011). Rather, ambiguities will be strictly construed against an insurer where the claimant "is squarely within the class of individuals whom the . . . policy was intended to benefit," which includes, but is not necessarily limited to, the parties to the contract. *Id.*

Applying this standard to the present case, this Court must interpret the policies at issue from a neutral stance. The policyholders themselves, Weinberger and his entities, are not seeking coverage—they have defaulted and are prohibited from doing so [DE 497]. As to the Fund, it is clearly a third party to these policies. Though the Fund asserts that it is standing in the shoes of the Weinberger Defendants and should receive the same beneficial policy interpretation as they would, the Fund is not entitled to such an interpretation merely based on the fact that its interests coincide with those of the Weinberger Defendants. The Fund no doubt desires the Weinberger Defendants to be insured in the maximum amount possible, but it is not a party to the insurance contracts nor is it a party to whom the policies were meant to provide coverage; the policies provide coverage for the named insureds and certain of their employees. While the Fund, as an excess insurer, required maintenance of certain primary insurance coverage, as would any excess insurer, this does not mean that the policies were taken out for its benefit, so the policy must therefore be evaluated from a neutral stance as to the Fund. *See Argonaut*, 953 N.E.2d at 615–16; *Am. Family Mut. Ins. Co. v. Nat'l Ins. Ass'n*, 577 N.E.2d 969, 971 (Ind. Ct. App. 1991) (interpreting an insurance contract from a neutral stance in a dispute between insurance

companies to determine their respective liability); *Ind. Lumbermens Mut. Ins. Co.*, 291 N.E.2d at 899 (same).

The Verhoeve Defendants are also third parties, as they are claimants against the insureds rather than parties who are intended to be covered under the policies. *Burkett v. Am. Family Ins. Grp.*, 737 N.E.2d 447, 452–53 (Ind. Ct. App. 2000) (interpreting an insurance policy from a neutral stance where the plaintiff was seeking to recover against another driver's insurance policy); *Barga v. Ind. Farmers Mut. Ins. Grp., Inc.*, 687 N.E.2d 575, 579 (Ind. Ct. App.1997) ("When, as here, however, the injured party is not the named insured, the policy is construed from a neutral stance."). Because all of the remaining disputes as to these policies are between the insurer and third parties, the policies must be interpreted from a neutral stance. This does not ultimately affect the outcome, however, as the Court determines that the policies are unambiguous as to all of the issues resolved herein.

### A.  Whether Weinberger's Malpractice Implicates Multiple Aggregate Limits in Any Policy

The largest point of contention is whether the "Annual Aggregate" limits listed for each insured in the policies that contain more than one named insured are cumulative and, if so, whether they each apply to Weinberger's malpractice—in other words, whether the maximum possible payout under each policy is $750,000, or whether it is $750,000 per policy times the number of insureds in each policy. Six of the policies at issue at least arguably have more than one insured—the 1010294 policy, each of the four policy periods under the MP32800 policy, and the MP50554 policy. All of those policies specify Mark S Weinberger, M.D. as an Insured Physician and Mark S. Weinberger, M.D., P.C. as an Insured Organization,[10] and four of the

---

[10] The 1010294 policy does not actually include Weinberger, PC on its declarations page, though the Fund argues that the fact that Medical Assurance issued a Certificate of Insurance for Weinberger, PC anyway means that it is

policies also list "The Nose and Sinus Center, LLC" as an Insured Organization.[11] [DE 170-1 to -6]. If the aggregate limits for each of those insureds can be recovered separately, then Medical Assurance could be responsible for an additional $7,500,000 in coverage. Medical Assurance contends that the Annual Aggregates for each policy are collective based on the policies' limitation of liability provisions, and that even if they were distinct, there are no claims at issue that would implicate the limits of any of the insureds other than Weinberger. The Verhoeve Defendants concur with this analysis. The Fund, however, argues that each insured has a separate aggregate limit that can be reached by the claims at issue. The Court addresses each argument in turn.

1.    **Whether the Policies Include Distinct Aggregate Limits for Each Named Insured**

a.    **The MP32800 and MP50554 Policies**

The Coverage Summary page of each of the MP32800 and MP50554 policies contains a chart that lists the insured parties and, next to each insured party, states the primary limits of liability for "Each Medical Incident" and the "Annual Aggregate," the deductible, and the premium. Each of these items is set forth separately for each insured. These charts are introduced by a clause that states, "The following are insured under the policy, with the following *respective* limits of liability." [*Id.* (emphasis added)].

Despite the heated disagreement between the parties, the Court concludes that the MP32800 and MP50554 policies unambiguously provide for separate aggregate limits for each

_____

covered under the policy. The Court need not reach this question, however, as it concludes that the 1010294 policy would not provide a distinct aggregate limit even if it did cover Weinberger, PC, as discussed *infra*.

[11] Those four policies are the latter three MP32800 policies and the MP50554 policy. Subspecialty Centers of America, LLC, Deirdre A. Durkis, M.D., and Rejuvenating Laser Spa, LLC are also specified under certain of the policies, but no party has suggested that any liability of those insureds is at issue, so the Court's analysis will not consider any limits applicable to those parties.

named insured. The parties focus their arguments as to this issue on provisions under the "Limits of Liability and Deductibles" section of the policy, which state as follows:

> The limit of liability specified in the **Coverage Summary** for each **insured** as "each medical incident" is the total of **our** liability to such **insured** resulting from any one **medical incident**.

> The limit of liability stated in the **Coverage Summary** for each **insured** as "annual aggregate" is the total limit of **our** liability to such **insured** resulting from all **medical incidents** which occur during the **policy period**.

> The limit of liability shall apply regardless of:

> A.      the number of persons or entities claiming **damages** covered by the **policy**;
> B.      the number of claims or suits brought on account of a **medical incident**;
> C.      the number of **insureds** under the policy; or
> D.      the inclusion of an additional insured.

[DE 170-2 p. 16, -3 pp. 23–24, -4 pp. 26–26, -5 pp. 17–18 (bold in original, denoting terms defined within the policies)].

Medical Assurance argues that this "is unambiguously an 'anti-stacking' provision." [DE 528 p. 19]. Focusing particularly on the latter half of this provision, Medical Assurance argues that the aggregate limits cannot be distinct because they expressly apply regardless of the number of insureds or the number of claims. Contrary to Medical Assurance's argument, however, the plain language of this provision clearly provides that each of those limits is distinct. It states that the limit of liability "for *each* insured" is the total limit of Medical Assurance's liability "to *such* insured." [*E.g.*, DE 170-2 p. 16 (emphasis added)]. Thus, rather than indicate that each limit is the collective limit, this provision establishes that the limits remain separate from each other regardless of how many insureds or claims there are; the policy provides that any payments against the limits of one entity are only attributed to *that* entity, and not to the others.

The importance of this language is demonstrated by comparison to how courts have interpreted slightly different language in other cases. In *Liddy v. Companion Ins. Co.* 390 N.E.2d

1022 (Ind. Ct. App. 1979), the parties disputed whether the policy's limits for uninsured motorist protection applied separately to each of the cars insured under the policy, or whether there was only one applicable limit. *Id.* at 1029. The policy contained a provision stating that "the limit of liability stated in the declarations as applicable to 'each accident' is the total limit of the company's liability for all damages . . . as a result of any one accident." *Id.* The court concluded that this language unambiguously provided for only one recovery up to the per-person limit for each incident involving an uninsured motorist, even though each insured car carried its own separate uninsured motorist coverage limit. *Id.* at 1029–32. The Seventh Circuit came to the same conclusion in interpreting similar language in *Grinnell Select Ins. Co. v. Baker*, 362 F.3d 1005, 1006–07 (7th Cir. 2004).

A crucial difference in the language used here leads to the opposite result, however. Whereas the policies in *Liddy* and *Grinnell* stated that each of the limits of liability was the total limit of the company's liability for any one accident, the policy here states the limits of liability for each insured is the total limit of Medical Assurance's liability "to such insured," not just the limit of their liability at all. [*E.g.*, DE 170-2 p. 16]. Had the policies omitted the phrase "to such insured" from these provisions, this provision would parallel the language in *Liddy* and *Grinnell*, and there would be little question that there is only one aggregate limit under the policy. The policies also could have contained a separate provision expressly stating the maximum annual aggregate limits under the policy. That not being the case, however, the unambiguous language of the policy requires this Court to conclude that each insured carries a separate aggregate limit under these policies.

Based on that interpretation, the provision stating that the limits "shall apply regardless of . . . the number of insureds under the policy" cuts in exactly the opposite direction than what

Medical Assurance argues. Medical Assurance relies on *Grinnell*, in which the Seventh Circuit, applying Illinois law, held that a substantially similar provision removed any ambiguity that may have otherwise existed as to whether the policy contained only one aggregate limit, calling the provision a "disambiguator." 362 F.3d at 1007. This analogy falls short, however, because the policy here defines the "limit of liability" as the limit of liability to "each insured." The effect of the provision here is therefore to remove any ambiguity that the aggregate limits remain distinct regardless of the number of insureds, and that the insureds can each recover from Medical Assurance up to the aggregate limit regardless of how many other insureds there are or how many claims may have been made against them.

This interpretation does not render the "disambiguator" provision superfluous. It would still have meaning, for example, in the instances in which a policy includes more than one insured physician, such as the MP52800 policy from 2003 to 2004, which names both Weinberger and Deirdre A. Durkis, M.D. as insured physicians. In that policy, the "disambiguator" provision would have the effect of clarifying that the limits of liability for Weinberger, PC arising out of malpractice for which the insured physicians are vicariously liable would remain the same even though the policy includes multiple named physicians. Thus, if Weinberger, PC's aggregate limit had been met through claims against Weinberger for which he was liable based on the malpractice of other employees, the policy would provide no further coverage for similar claims against Dr. Durkis. Similarly, if a claim was brought for malpractice against another employee and both Weinberger and Dr. Durkis would be vicariously liable for that claim, the per-incident limit for Weinberger, PC would remain $250,000 even though there are multiple insured physicians. This latter scenario is an example of where the parties' extensive discussions of "anti-stacking" provisions would come into play.

Medical Assurance further argues that the policies cannot be read to provide separate aggregate limits because the insured organizations paid only nominal premiums, $100 per organization. Though courts have referred to the premiums paid by parties in considering whether the insured could have reasonably expected to receive additional coverage limits, such factors will not outweigh the plain and unambiguous language of the policy. *Am. Family Mut. Ins. Co. v. Nat'l Ins. Ass'n*, 577 N.E.2d 969, 971 (Ind. Ct. App. 1991) ("[O]ur goal is to ascertain and enforce the parties' intent *as manifested in the insurance contract*. We cannot extend coverage beyond that provided in the contract and *we may not rewrite the plain and unambiguous language* of the insurance contract." (emphasis added)). In addition, as the Fund notes, Medical Assurance also submitted Certificates of Insurance to the Fund for each of the insured organizations, which is a prerequisite to receiving the protections of the damages caps under the Medical Malpractice Act. The Fund has submitted evidence showing that it issued letters to each of the insureds under the MP50554 policy confirming that their coverage limits qualified them for protection under the Act, and the Fund never received a response from any of the insureds correcting it or indicating that they did not actually have the coverage limits as indicated. [DE 539-3]. An insured would not reasonably expect to receive those protections without securing the required coverage limitations, so this effectively offsets Medical Assurance's argument.[12]

### b. The 1010294 Policies

Though the parties pay little attention to the 1010294 policies and simply state that the language is "strikingly similar" to the other policies [DE 511 p. 4], several key differences in the

---

[12] That is not to say that submission of the Certificates of Insurance would necessarily bring those organizations under the Medical Malpractice Act, as that may still be in dispute. However, since the only reason to submit a Certificate of Insurance would be to receive the Act's protections, an insured could reasonably believe that they had coverage that would satisfy the Act's prerequisites if such a certificate was filed.

1010294 policies actually lead to a different result. Similar to the policies in *Liddy* and *Grimmer*, the 1010294 Policies state that "[t]he limit of liability stated in the declarations as 'annual aggregate' is the total limit of the Company's liability for damages resulting from all medical incidents which occur during the policy period." [DE 170-7, -8]. This makes it without question that the annual aggregate limit, which is also only stated once rather than separately for each insured, is the total amount that Medical Assurance could have to pay out under the policy. Unlike the other policies, which state that the respective aggregate limits are the limit of the company's liability "to such insured," this provision is absolute and contains no such qualifier. The provision stating that the limits remain the same regardless of the number of insureds therefore reinforces that the total potential liability under the policy would be the one aggregate limit.

The 1010294 policies therefore unambiguously provide for only one aggregate limit regardless of the number of insureds. As to the policy periods from 1996 through 1999, this issue is inconsequential since the parties agree that there were few enough claims made that even a single aggregate limit would not be reached. However, this determination moots the dispute as to the 1999 to 2000 policy period. That policy states that it only includes "Individual" coverage, and does not reference coverage for the "Corporation," as did the prior policies. However, Medical Assurance issued a Certificate of Insurance for Weinberger, PC, anyway, which the Fund argues must mean that Weinberger, PC is also covered under the policy. Because only one single aggregate limit would apply regardless of whether the policy provided coverage for Weinberger, PC, though, it does not matter whether the policy included "Corporation" coverage or not, so this question need not be resolved.

## 2. Whether the Insured Organizations' Aggregate Limits Apply to Weinberger's Malpractice

Having determined that the aggregate limits apply separately to each insured under the MP32800 and MP50554 policies, the next question is under what circumstances those limits can be reached. There are essentially two classes of claims that are or may be at issue. The primary claims—in fact, the only ones that have been raised at all—arise out of acts of malpractice by Weinberger himself. The Verhoeve Defendants assert that these are the only claims they have raised in the underlying actions, and that any liability as to the entities is only vicarious liability arising out of Weinberger's malpractice. [DE 512-4 ¶ 3]. The parties have apparently not foreclosed the possibility of asserting direct liability against the entities, though, so it is at least possible that actions may be brought against the entities for their own negligence or for the negligence of health care providers other than Weinberger, even though such claims have not yet been made.

As to liability against the entities arising out of Weinberger's malpractice, however, it is ultimately immaterial whether the policies provide separate limits that could possibly provide coverage, since the Indiana Medical Malpractice Act does not require resorting to such other potential coverage once a physician's own aggregate policy limit has been reached. The Medical Malpractice Act establishes a comprehensive scheme addressing medical malpractice actions. In addition to creating procedural frameworks for the processing of malpractice claims and capping the total damages that malpractice claimants may receive, the Act strictly caps the damages for which participating health care providers can be held liable. If a claimant seeks damages beyond the limits applicable to a participating health care provider, those amounts are paid by the Patient's Compensation Fund, which provides this excess coverage in return for annual surcharges paid by all participating health care providers.

To participate in the Act, a health care provider must be "insured by a policy of malpractice liability insurance in the amount of at least two hundred fifty thousand dollars ($250,000) per occurrence and seven hundred fifty thousand dollars ($750,000) in the annual aggregate." Ind. Code § 34-18-4-1(1). By filing a certificate of insurance demonstrating that the health care provider has secured insurance in those amounts, and by paying an annual surcharge to the Fund, the health care provider receives the protection of damages caps and essentially purchases excess insurance coverage from the Fund for any amounts beyond those caps. *Id.*; Ind. Code § 34-18-13-1.

For participating health care providers, the Act sets express limitations on their liability for malpractice: "A health care provider qualified under [the Act] . . . is not liable for an amount in excess of two hundred fifty thousand dollars ($250,000) for an occurrence of malpractice." Ind. Code § 34-18-14-3(b). In other words, a health care provider is not liable for more per occurrence than their required insurance will cover anyway. In addition, other health care providers, such as a health care provider's employer, cannot be held liable for any amounts over and above this cap solely on account of that health care provider's malpractice, though they could face additional liability for other acts of malpractice that contribute to a claimant's injuries. Ind. Code § 34-18-14-3(d). Because the Act allows a malpractice claimant to recover up to $1,250,000 in damages for each injury suffered due to malpractice, all damages beyond the health care providers' per-occurrence limits are paid by the Fund. Ind. Code § 34-18-14-3(a)(3), (c).

The Act also provides similar limits relative to a health care provider's annual aggregate coverage. Specifically, it states:

> If an annual aggregate for a health care provider qualified under this article has been paid by or on behalf of the health care provider, all amounts that

24

may subsequently become due and payable to a claimant arising out of an act of malpractice of the health care provider occurring during the year in which the annual aggregate was exhausted shall be paid from the patient's compensation fund . . . .

Ind. Code § 34-18-6-6(a). Notably, this provision applies to "*all amounts* . . . arising out of an act of malpractice of the health care provider" once that health care provider's annual aggregate has been reached through payments "by or on behalf of" that health care provider. *Id.* (emphasis added). This means that the Fund assumes this obligation upon the exhaustion of an aggregate limit regardless of whether any other entity, such as a physician's employer, may be vicariously liable for the health care provider's malpractice and have additional coverage. *Id.* The provision also only requires that "an annual limit" be met, not "all applicable limits." *Id.* Once that limit is met, the Fund pays all further damages and the health care provider loses any right to object to a settlement. Ind. Code § 34-18-6-6-(a)(1). This shows that the provision does not simply require the Fund to make these payments subject to subrogation, as it does when a health care provider fails to pay a judgment against it, Ind. Code § 34-18-15-4, but that the Fund actually becomes liable for such damages in place of the health care provider. Otherwise, this provision would deny health care providers their ability to defend against further liability.

If the Act meant for the Fund to assume the obligations only after the health care provider's annual aggregate *and the annual aggregate of any other health care provider that is liable on account of that health care provider's malpractice* were exhausted, it could easily have done so. Instead, it states—in mandatory terms (amounts "*shall be paid* from the patient's compensation fund" once an annual aggregate has been met)—that once an annual aggregate has been met, the Fund assumes all further obligations. *Id.* (emphasis added). Thus, whether or not any of the insured entities here have additional aggregate limits apart from Weinberger's, the Act does not require, or even permit, those limits to be accessed on account of Weinberger's

malpractice. As a result, Medical Assurance is only liable for up to one annual aggregate limit in each policy on account of Weinberger's acts of malpractice. Once that annual aggregate limit has been met, all further liability against any covered health care provider arising out of Weinberger's malpractice is transferred to the Fund.

Having concluded that the separate aggregate limits for the insured organizations do not provide coverage for Weinberger's malpractice, the question that is left is under what circumstances those limits apply to malpractice by health care providers other than Weinberger. The parties argue over whether the entities' limits provide coverage to the insured organizations for any such claims, or only for claims for which Weinberger is also liable on account of his role in the organization. The Court need not resolve this question, however, because it is beyond the scope of the issues that are presently in dispute. The Verhoeve Defendants' counterclaim asks only that this Court declare the total aggregate limits "of all of the professional liability insurance policies at issue in this litigation providing coverage *for all the underlying medical negligence claims identified in the Complaint*." [DE 290 (emphasis added)]. However, the parties insist that all of the underlying claims only assert liability arising out of Weinberger's malpractice, not for malpractice directly attributable to any other individual or entity. [DE 512-4 ¶ 3 ("All of the Verhoeve Defendants' claims are made against Dr. Weinberger's corporate entities under the doctrine of respondeat superior; and we have not identified any independent, specific acts of medical malpractice by the employees of these corporate entities."); DE 528 pp. 14–15].

Additionally, being that the Court has already concluded on statutory grounds that the Weinberger Entities' coverage does not apply to Weinberger's malpractice, there is only a relatively small subset of claims that could be affected by this determination—claims for malpractice brought against the organizations or other covered employees, for which Weinberger

would not be liable on account of his role in the organization. It is unlikely that any such claims will be brought, as nearly ten years have now passed since the policies in question were in effect and the parties represent they have not yet identified any such claims. Consequently, since these issues are not currently in dispute, and might never be, the Court will refrain from ruling on this question at this time.

Therefore, the Court concludes that while each of these policies carries a separate aggregate limit for each named insured, only Weinberger's own aggregate limits are implicated on account of his own acts of malpractice. While the entities' respective aggregate limits can apply to acts of malpractice other than those of Weinberger, the Court need not and does not determine the precise contours of such coverage.

**B.     The $1,000,000 Additional Coverage Limits**

In addition to the primary limits, the parties dispute whether any of the excess coverage contained in the policies at issue can be reached here. Four of the policies provide for $1,000,000 in "Additional Coverage." The MP32800 policy was amended by an endorsement effective March 18, 2003, to add $1,000,000 of excess coverage for Weinberger. The following policy period, June 1, 2003 to June 1, 2004, also included these additional limits. The MP50554 policy included $1,000,000 in excess coverage for Weinberger as well, and the HP888 policy included $1,000,000 in excess coverage for the Merrillville Center for Advanced Surgery, LLC. According to Medical Assurance, these additional coverage amounts were added because Weinberger lived in Illinois, and this coverage would protect him if he was subject to any claim to which Indiana's Medical Malpractice Act would not apply.

For the same reasons that the insured entities' individual coverage limits do not come into play, however, none of these excess coverage policies applies either. Weinberger's aggregate

limits will clearly be exhausted as to each of the policies at issue here, and the Act provides that "all amounts" payable on account of Weinberger's malpractice subsequent to the exhaustion of "an aggregate limit" (not *all potential coverage*) "shall be paid" by the Fund. Ind. Code § 34-18-6-6(a). All of these policies are expressly excess policies and apply only "after exhaustion of the Primary Limits of Liability applicable to such insured." [DE 170-2 p. 16, -3 p. 24, -4 p. 26; *see* DE 170-10 p. 15].  Because these policies by definition apply only after the aggregate limit has been exhausted, and the Fund is liable by operation of law after that point, these policies do not trigger any additional liability under the Act on account of Weinberger's malpractice. Under any other interpretation, these additional limits would be entirely gratuitous so far as they would apply to these claims, as the Fund assumes all liability once an aggregate limit is met and the Act imposes no requirement to carry such coverage. Ind. Code § 34-18-6-6(a). This construction does not render these policies superfluous, however, because they would have provided Weinberger with coverage if he was sued outside of Indiana, where he may not have had the protection of damages caps and where he may not have received the excess coverage from the Fund.

Three of these policies also contain provisions that expressly exclude coverage for amounts payable by the Fund, and Medical Assurance cites these provisions as an independent ground for holding that the excess coverage does not apply here. Specifically, these provisions exclude coverage for any damages:

> payable by the Indiana Patient's Compensation Fund or other similar state-administered fund established for the payment of such damages or that would have been payable by any such fund except for the insured's failure to pay, when due, the applicable fund surcharge or other legally-required charge of any such fund."

[DE 170-2 p. 21, -4 p. 5, -10 p. 20].  Medical Assurance argues that because all of the claims at issue arose in Indiana and were subject to the Act, all damages subject to these excess policies are payable by the Fund and are thus excluded from these limits.  This argument assumes its

conclusion, however. The provision excludes coverage for amounts "payable by the [Fund]," not damages for all claims brought pursuant to the Act. Thus, if the Act required exhaustion of all applicable insurance before the Fund would assume liability, then this provision would not exclude any coverage at all, since the damages would not be "payable" by the Fund until these excess limits were exhausted. Since the Fund automatically assumes liability for all amounts past an aggregate limit, however, these amounts are not covered under the policies even without the presence of this exclusion.

This conclusion makes the last point of contention as to these additional coverage limits moot. One of the four policies omitted the endorsement that contained the above exclusion. Medical Assurance claims that the omission was due to a "clerical filing error," and asks the Court to reform the contract to conform to the parties' purported intention. However, since the Court has concluded that these additional coverage limits do not apply regardless of the presence of these exclusions, it is not necessary to determine whether this exclusion should be considered part of the policy.

**C.** **The Merrillville Center for Advanced Surgery, LLC Policies**

There are also three policies that apply only to the Merrillville Center: two policy periods providing primary coverage—policy number HP515—and one policy providing excess coverage as well—policy number HP888. For the same reasons as previously discussed, however, none of these policies provide coverage for Weinberger's own malpractice where his own aggregate limits will clearly have been exhausted. Ind. Code § 34-18-6-6(a); *see supra* Sections IV.A.2, IV.B. Medical Assurance also argues that it could not be liable on account of these policies because there is no basis under which the Merrillville Center can be liable for Weinberger's malpractice. However, that argument only goes to the merits of the underlying claims, which are

not at issue here. The question is whether the policies would cover damages arising out of Weinberger's individual acts of malpractice, and the Court can conclude that they do not without needing to inquire into the merits of such claims.

**D.      The MP32800 Policy Limits for 1998 to 1999**

Finally, the Fund argues that the limits applicable to the MP32800 policy for the period of September 23, 1998 to September 23, 1999, are $250,000 per occurrence and $750,000 in aggregate, whereas the other parties assert that the limit is $100,000 per occurrence and $300,000 in aggregate. None of the other parties acknowledged or responded to the Fund's arguments in this respect, however. This policy itself indicates that it initially carried the lower limits, but was amended effective July 1, 1999, to comply with legislation that increased the minimum amount of coverage required to qualify for protection under the Act. [*See* DE 170-7 pp. 18, 24]. Being that the aggregate limit was increased during the policy period, the maximum amount for which Medical Assurance could be responsible under the policy would be $750,000, assuming that enough claims were made to implicate the aggregate limit.  Since the parties agree that only two claims were brought during that policy period, though, the more pertinent question is which per-occurrence limits applied. However, the record does not reflect whether the malpractice on which the claims were based occurred prior to or after the limits were amended. The Court is therefore unable to determine the amounts for which Medical Assurance may be liable based on these claims. Since the present motions deal only with the policy limits, however, it is sufficient to hold that the total aggregate limits for the policy are $750,000. If and when the parties dispute which per-incident limits that apply to these claims, the Court can decide this issue at that time.

### E.   Summary

To summarize each of the foregoing conclusions, the following chart sets forth the applicable policies and each of the aggregate limits that can be reached on account of Weinberger's malpractice:

| Policy No. | Period | Aggregate Limit Applicable to Weinberger's Malpractice |
|---|---|---|
| **1010294** | 9/23/96 to 9/23/97 | $300,000 |
| | 9/23/97 to 9/23/98 | N/A |
| | 9/23/98 to 9/23/99 | $750,000 [13] |
| | 9/23/99 to 9/23/00 | $750,000 |
| **MP32800** | 6/1/00 to 6/1/01 | $750,000 |
| | 6/1/01 to 6/1/02 | $750,000 |
| | 6/1/02 to 6/1/03 | $750,000 |
| | 6/1/03 to 6/1/04 | $750,000 |
| **MP50554** | 6/1/04 to 10/29/04 | $750,000 |
| **HP515** | 11/6/02 to 11/6/03 | $0 |
| | 11/6/03 to 11/6/04 | $0 |
| **HP888** | 11/6/03 to 11/6/04 | $0 |
| | Total = | $5,550,000 |

The Weinberger Entities have various other annual aggregate limits as well, but those limits cannot be reached on account of acts of malpractice committed by Weinberger himself since his own aggregate limits will have already been exhausted in all such policy periods.

There are two other qualifications to note about these calculations. First, they do not take into account the number of claims that have been brought in any policy period. Several of the policy periods in question had few enough claims that the aggregate limits would not be reached. However, the present issue is the extent of the policies' aggregate limits, not simply Medical Assurance's total exposure based on the existing claims, so it is appropriate to omit any such reductions.  Second, for the same reasons, these calculations do not reflect any amounts Medical

---

[13] Because this limit changed mid-policy, the limits that apply to the claims at issue may be less.

Assurance may have already paid to settle or satisfy judgments for Weinberger's malpractice. Though Medical Assurance subtracted $250,000 from its calculations in the present briefs based on one settlement, this number has likely escalated based on the recent settlement of the Thomas Defendants' claims. Again, however, because the question is the policies' aggregate limits and not whether Medical Assurance has exhausted those limits or what its remaining exposure may be, those figures need not be addressed at this time.

Finally, since this conclusion resolves some, but not all, of the claims at issue in this action, Medical Assurance has requested that this Court direct entry of final judgment as to this claim and find that there is no just reason for delay. [DE 527]. Under Federal Rule of Civil Procedure 54(b), "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." The Court cannot conclude that there is no just reason for delay, however. This Order only resolves the Verhoeve Defendants' counterclaim against Medical Assurance regarding the aggregate limits of the policies at issue. The claims in Medical Assurance's Complaint, which seek declaratory judgment that Medical Assurance is not liable in the first place, are still at issue, and a resolution of those claims in favor of Medical Assurance would essentially render the issues at question in this Order moot. The Court therefore declines to enter a final, appealable order as to the Verhoeve Defendants' counterclaim at this time.

## V.    ADDITIONAL MATTERS

There are several other matters unrelated to these motions for summary judgment that can also be addressed. The parties report that the Fund and the Verhoeve Defendants have reached a settlement, and that the settlements have been finalized except as to thirty-two of the Verhoeve Defendants who need approval from bankruptcy or probate courts in order to finalize the

settlement. Pursuant to the settlement, the Fund and the Verhoeve Defendants, with those thirty-two exceptions, have stipulated to the dismissal of the Fund's counterclaim against each of those Verhoeve Defendants [DE 576]. Though the stipulation was not signed by all parties to the action, no party has objected to the dismissal of this counterclaim. The Court therefore construes the stipulation as a motion, and GRANTS the motion. The Fund's counterclaim against the Verhoeve Defendants [DE 313] is DISMISSED WITH PREJUDICE pursuant to Federal Rule of Civil Procedure 41(a)(2) against all Verhoeve Defendants, as defined in paragraph 8 of Medical Assurance's Second Amended Complaint [DE 53], EXCEPT as to the "Remaining Verhoeve Defendants," as defined in the stipulation [DE 576]. The Verhoeve Defendants' motion for summary judgment as to judicial estoppel [DE 516] is therefore DENIED as moot as to the counter-defendants who have been dismissed. The Remaining Verhoeve Defendants and the Fund have also filed a joint motion to withdraw the motion for summary judgment pending final approval of their settlement agreement [DE 577]. That motion is GRANTED, and the motion for summary judgment as to judicial estoppel [DE 516] is DISMISSED without prejudice to re-filing as to the Remaining Verhoeve Defendants.

The Fund has similarly settled with the Thomas Defendants, and those settlements have been finalized with the exception of four defendants who are awaiting approval from a bankruptcy court. Those parties have therefore filed a stipulation to dismiss the Fund's cross-claims against the Thomas Defendants [DE 578], and there has been no objection to dismissing those cross-claims. There is a point that must be clarified here, however. The malpractice claimants have been proceeding in this action in two groups: the Verhoeve Defendants and the Thomas Defendants. However, Medical Assurance's Complaint actually lists three groups of malpractice claimants—the Verhoeve Defendants, the Thomas Defendants, and the "Remaining

Defendants." [DE 53 ¶¶ 8–10]. The Remaining Defendants have the same counsel as the Thomas Defendants, and have been treated as members of the Thomas Defendants throughout this litigation. However, the Fund's cross-claim against the Thomas Defendants does not include the Remaining Defendants; the cross-claims specifically define the Thomas Defendants as those individuals listed in paragraph 9 of Medical Assurance's Second Amended Complaint, and that paragraph lists only the Thomas Defendants, not the Remaining Defendants. [DE 313 n.2]. The docket also lists each of the Thomas Defendants, but not the Remaining Defendants, as "Cross Defendant[s]." Thus, though the docket text indicates that the stipulation to dismiss the Fund's cross-claims was filed on behalf of individuals comprising both the Thomas Defendants and the Remaining Defendants, the Fund has not pled any cross-claim against the Remaining Defendants in this action, so there are no claims against those defendants to be dismissed.

Therefore, the stipulation to dismiss [DE 578], which the Court construes as a motion, is GRANTED as to all of the Thomas Defendants, meaning those identified in paragraph 9 of Medical Assurance's Second Amended Complaint [DE 53], EXCEPT as to Michael Guttman and Christopher Smulski. The Fund's cross-claims [DE 313] are accordingly DISMISSED WITH PREJUDICE as to those cross-defendants pursuant to Federal Rule of Civil Procedure 41(a)(2). However, the stipulation to dismiss [DE 578] is DENIED as to the Remaining Defendants, as defined in paragraph 10 of Medical Assurance's Second Amended Complaint [DE 53], against whom no cross-claims are pending.

The Thomas Defendants also have a motion for summary judgment pending as to the PCF's cross-claims on the basis of judicial estoppel. [DE 524]. The list of movants in the motion includes both the Thomas Defendants and the Remaining Defendants. [*Id.*] As to the Thomas Defendants who have been dismissed with prejudice, that motion is DENIED as moot. The

motion is likewise DENIED as to the Remaining Defendants, since there are no cross-claims against them on which the Court can grant judgment. That leaves only the two Thomas Defendants who have not been dismissed, Michael Guttman and Christopher Smulski, as movants. Although they have not moved to withdraw the motion, based on the representation that they have settled their claims and are only awaiting court approval of those settlements, the Court DISMISSES the motion for summary judgment as to those two cross-defendants, without prejudice to re-filing should the settlements not become final.

## VI.    CONCLUSION

For the foregoing reasons, the Court rules as follows: Medical Assurance's Motion to Strike ¶ 4 of DE 512-4 [DE 546] is DENIED. Medical Assurance's motion to accept a redacted exhibit [DE 550] is GRANTED. Medical Assurance's Motion to Strike as to DE 539, 539-1 [DE 547] is DENIED. Medical Assurance's motion to suspend briefing [DE 549], the Verhoeve Defendants' and the Fund's motion for expedited ruling [DE 558], and Medical Assurance's motion to strike the motion for expedited ruling [DE 560] are each DENIED as moot. Additionally, the motions for summary judgment [DE 510, 527] are GRANTED in the amount of $5,550,000. The Court therefore GRANTS Declaratory Judgment as to the Verhoeve Defendants' Counterclaim for Declaratory Relief as to the total aggregate limits, per policy year, for claims arising out of Weinberger's malpractice [DE 290] as follows:

| Policy No. | Period | Aggregate Limits Applicable to Weinberger's Malpractice |
|------------|--------|--------------------------------------------------------|
| **1010294** | 9/23/96 to 9/23/97 | $300,000 |
|  | 9/23/97 to 9/23/98 | N/A |
|  | 9/23/98 to 9/23/99 | $750,000 |
|  | 9/23/99 to 9/23/00 | $750,000 |
| **MP32800** | 6/1/00 to 6/1/01 | $750,000 |
|  | 6/1/01 to 6/1/02 | $750,000 |

| | | |
|---|---|---|
| | 6/1/02 to 6/1/03 | $750,000 |
| | 6/1/03 to 6/1/04 | $750,000 |
| **MP50554** | 6/1/04 to 10/29/04 | $750,000 |
| **HP515** | 11/6/02 to 11/6/03 | $0 |
| | 11/6/03 to 11/6/04 | $0 |
| **HP888** | 11/6/03 to 11/6/04 | $0 |
| | Total = | $5,550,000 |

In addition, the stipulation to dismiss Fund's counterclaim against certain of the Verhoeve Defendants [DE 576] is GRANTED, and the Fund's counterclaim against the Verhoeve Defendants [DE 313] is DISMISSED WITH PREJUDICE, except as to the Remaining Verhoeve Defendants, as defined in docket entry 576. The Verhoeve Defendants' motion for summary judgment as to judicial estoppel [DE 516] is DENIED as moot as to the dismissed Verhoeve Defendants. The joint motion by the Fund and the Remaining Verhoeve Defendants to withdraw the motion for summary judgment [DE 577] is GRANTED, and the motion for summary judgment [DE 516] is DISMISSED without prejudice to re-filing as to the Remaining Verhoeve Defendants.

The stipulation to dismiss the Fund's cross-claims against certain of the Thomas Defendants [DE 578] is GRANTED as to all movants that are identified as Thomas Defendants in paragraph 9 of Medical Assurance's Second Amended Complaint [DE 53]. The Fund's cross-claims [DE 313] are accordingly DISMISSED WITH PREJUDICE as to those cross-defendants, which include all of the Thomas Defendants EXCEPT for Michael Guttman and Christopher Smulski. However, the stipulation to dismiss [DE 578] is DENIED as to the Remaining Defendants, as defined in paragraph 10 of Medical Assurance's Second Amended Complaint [DE 53]. Accordingly, the Thomas Defendants' motion for summary judgment as to judicial estoppel [DE 524] is DENIED as moot as to the dismissed Thomas Defendants, is DISMISSED

without prejudice to re-filing as to Michael Guttman and Christopher Smulski, and is DENIED as to the Remaining Defendants.

SO ORDERED.

ENTERED:  <u>September 24, 2013</u>

<div style="margin-left:45%">

<u>      /s/ JON E. DEGUILIO      </u>
Judge
United States District Court

</div>