UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

THE MEDICAL ASSURANCE )
COMPANY, INC. )
 )
    Plaintiff, )
 )
    v. ) Case No. 4:06-CV-117-JD
 )
MARK S. WEINBERGER, M.D., *et al.*, )
 )
    Defendants. )

**OPINION AND ORDER**

Now before the Court are Plaintiff Medical Assurance Company, Inc.'s motion to dismiss the Patient's Compensation Fund from this matter for lack of standing, as well as two motions by the Patient's Compensation Fund relative to this Court's September 24, 2013 Order addressing the applicable aggregate policy limits. The Court addresses each motion in turn, and DENIES each motion.

**A.    Motion to Dismiss the Patient's Compensation Fund**

Medical Assurance seeks to dismiss the Patient's Compensation Fund ("the Fund") (which is a party to this matter through its commissioner, Stephen W. Robertson) on the basis that it no longer has standing. As thoroughly detailed in prior orders, Medical Assurance initiated this action seeking a declaratory judgment that it did not owe coverage on policies it issued to Dr. Mark S. Weinberger and several entities with which he was affiliated. Over 350 medical malpractice claims have been brought against Weinberger, so Medical Assurance named those malpractice claimants, who would likely look to Medical Assurance to recover any judgments they secured against Weinberger, as defendants. Those malpractice claimants have primarily participated in this matter in two groups, referred to as the Thomas Defendants and the Verhoeve

Defendants. In addition, because the Fund becomes liable for any medical malpractice judgments that an insurer fails to pay or that are beyond the healthcare provider's policy limits, Medical Assurance named the Fund as a defendant as well. [DE 1, 53]. The Fund filed a counterclaim against Medical Assurance essentially seeking the opposite declaration—that Medical Assurance owes coverage under its policies and that the Fund is not required to compensate any of the malpractice claimants until Medical Assurance has exhausted its applicable policy limits. [DE 59].

After many years of litigation, the Fund has now reached global settlements with the malpractice claimants that will ultimately settle any claims those claimants may have against it. [DE 558, 559-1, -2]. Thus, while the extent of Medical Assurance's liability remains in question, and while the Fund has reserved the right to seek recovery from Medical Assurance, no party will be able to seek any additional payments from the Fund once these settlements are complete. This prompted Medical Assurance's current motion, in which Medical Assurance argues that the Fund no longer has standing to litigate relative to the existence of coverage for these claims, since none of the claimants can seek any further recoveries from the Fund. [DE 572].

Notably, however, those settlements have not been completed as to all of the claimants, as a number of the claimants have bankruptcy or probate estates open and require court approval of the agreements.[1] The Release Agreement apparently signed by each of the Verhoeve Defendants states that they must obtain all necessary bankruptcy or probate court approvals "prior to . . . being entitled to receive the Allocation" of the settlement funds. [DE 559-2 p.15].

---

[1] The Court's records currently reflect that bankruptcy or probate court approvals are still pending for Susan Bowron, Laura Heinrichs, Lorraine Leyba, Jane Mindas, Bobby Moore, Lori St. Clair, Richard Swanson, William Tobias, Tony Diaz, Pamela Marley, Wanda Anthony, Stephanie Oslizlo, Claudia Trevino, Michael Goodfellow, and John Earp. [DE 576, 578, 596, 606, 607, 617].

Further, those claimants only release the Fund from liability "[u]pon payment to [the claimant] of the Allocation." [*Id.*] Thus, those claimants will not have released the Fund from any liability until the settlements are approved by the bankruptcy or probate courts and the claimants receive the settlement funds. The Release Agreement with the Thomas Defendants is similarly limited. [DE 559-1].

Because these settlements are not complete and the claimants have not all released the Fund from its potential liability, the Fund still has standing to litigate over whether Medical Assurance owes coverage for the malpractice claims, as raised in Medical Assurance's Complaint [DE 53] and the Fund's Counterclaim [DE 313]. *Already, LLC v. Nike, Inc.*, on which Medical Assurance heavily relies, reinforces this conclusion. 133 S.Ct. 721 (2013). There, the Supreme Court held that a "case or controversy" no longer existed where a party signed a covenant that "unconditionally and irrevocably" withdrew its claims. *Id.* at 728. However, the releases here are expressly conditioned on outside events that have not yet occurred, and which may not occur. The dispute is still "live" until those releases take effect, so Medical Assurance's motion to dismiss for lack of standing is premature. As succinctly stated by the Fund, "The [Fund] has standing until all of the claims against the [Fund] brought by the Verhoeve Defendants and Thomas Defendants are dismissed. That has not happened." [DE 595]. The Court therefore need not consider whether the Fund's prospect of recovery against Medical Assurance through statutory subrogation of the malpractice claimants' claims, which the Fund has raised in a separate action, gives it standing to litigate the existence of coverage in this action, and Medical Assurance's motion to dismiss is DENIED.

**B.     Motion to Reconsider Aggregate Limits**

Next, the Fund moves the Court to reconsider its previous ruling as to the aggregate policy limits that can be reached on account of Weinberger's malpractice. Prior to the Court's

3

ruling, all four active parties expressed their position on that question, including Medical Assurance, the Fund, the Verhoeve Defendants, and the Thomas Defendants, and the motions for summary judgment produced seven separate briefs on the merits. [DE 510, 511, 523, 527, 528, 531, 538, 539, 544, 545]. Medical Assurance argued that the limits were only $4.65 million, the Verhoeve and Thomas Defendants put that number at $8.35 million, while the Fund argued that the policies provided aggregate limits of $18.1 million.

The Court ultimately held that the policies provided $5.55 million in aggregate coverage for Weinberger's own malpractice (assuming Medical Assurance owed coverage in the first place). It found that while certain of the policies provided separate coverage limits for each of the insured parties, including Weinberger and several entities he controlled, the Indiana Medical Malpractice Act did not allow those entities' separate limits to be accessed on account of Weinberger's malpractice once his own aggregate limits were exhausted, so only Weinberger's own policy limits were applicable to these claims. The Fund has now moved the Court to reconsider only that last portion of its analysis, and this question has again been fully briefed. [DE 601, 602, 609, 615].

A Court retains the authority to reconsider any of its orders during the course of litigation prior to entering final judgment, Fed. R. Civ. P. 54(b), but for obvious practical reasons, reconsideration of such orders is generally limited to extraordinary circumstances. Those include where:

> the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.

*Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990).

"Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996).

The Fund has not demonstrated a proper basis for reconsideration here. It has not presented any new facts or any changes in the applicable law since the Court's ruling. Neither has it shown that the Court patently misunderstood it, made a decision outside the adversarial issues presented to the Court, or made an error of apprehension rather than of reasoning. Rather, it simply argues that the Court's ruling "is contrary to the provisions of the [Medical Malpractice] Act" and that it is "likely to lead to increased health care costs or the decrease of the availability of health care," [DE 615 p. 5], which does not justify reconsideration.

Additionally, the Fund's arguments fail to demonstrate that the Court made any error of reasoning in its previous order, as the statutory interpretations that the Fund urges the Court to adopt are internally inconsistent. The statutory provision upon which the Court based its decision states as follows:

> If an annual aggregate for a health care provider qualified under this article has been paid by or on behalf of the health care provider, all amounts that may subsequently become due and payable to a claimant arising out of an act of malpractice of the health care provider occurring during the year in which the annual aggregate was exhausted shall be paid from the patient's compensation fund . . . .

Ind. Code § 34-18-6-6(a). This provision contains three references to the term "health care provider." The first reference is to "a" health care provider, while the next two are to "the" health care provider, clearly indicating that each reference is to the *same* health care provider. However, the Fund argues that, as applied to this circumstance, the first two references to health care provider refer to "the Weinberger Defendants," including Weinberger and each of his additional

insured entities, while the third reference is solely to "Dr. Weinberger." In other words, the Fund's construction of this provision would require the Court to give the exact same term two different meanings within the same provision. In addition, this provision refers to "health care provider" in the singular, and the Fund has not identified any statutory basis for defining "*a* health care provider" as including the plural "Weinberger Defendants."

The Fund's other textual argument is that since the Act requires health care providers to maintain "at least" $750,000 in coverage in the annual aggregate in order to establish financial responsibility under the Act, the Act should be interpreted as requiring that every possible insurance policy by every insured party be exhausted before transferring liability to the Fund under § 34-18-6-6(a). Ind. Code § 34-18-4-1. However, this interpretation would be internally inconsistent as well. This provision states that a health care provider can become qualified under the Act by maintaining malpractice liability insurance "in the amount of at least two hundred fifty thousand dollars ($250,000) per occurrence and seven hundred fifty thousand dollars ($750,000) in the annual aggregate." *Id.* As used in this provision, "at least" applies both to the per-occurrence and annual aggregate limits. The Act expressly prohibits recovery from any health care provider of more than $250,000 per occurrence, though, without regard to how much insurance a health care provider carries, which the Fund acknowledges. Ind. Code § 34-18-14-3(b).

Thus, under the Fund's interpretation, "at least" would be superfluous as to the per-occurrence limits (which it directly precedes), but would override the plain language of § 34-18-6-6(a), which transfers liability to the Fund upon the exhaustion of "*an* annual aggregate for *a* health care provider," as to the annual aggregate limits. As noted in this Court's prior order, the more plausible interpretation of the use of "at least" in this context is that it recognized that

health care providers may procure additional coverage if they practice in other states, for example, where they may be subject to higher mandatory coverage or may want higher policy limits due to the absence of statutory caps on malpractice damages. [DE 591 p. 28]. In addition, the Act expressly defines "annual aggregate" as "the *limitation* on a health care provider's liability," which further reinforces the idea that the Act views the mandated coverage amounts as coterminous with the extent of a health care provider's liability. Ind. Code § 34-18-2-5 (emphasis added).

Furthermore, the Fund has not identified any reason why any health care provider would ever procure more than the minimum required amounts of coverage for claims under the Act. The additional coverage the Fund seeks to establish here would be purely gratuitous and/or coincidental, as there is no indication that the surcharges that health care providers pay to the Fund would be reduced for a health care provider that secures greater policy limits or for whose malpractice other entities may be vicariously liable. To the contrary, the Fund represents that it assesses surcharges uniformly to all physicians within the same specialty class,[2] which further refutes the Fund's assertion that the legislature contemplated health care providers procuring such additional coverage.

Finally, the Fund argues that because the Act only sets a floor for annual aggregate coverage, the Court should interpret the annual aggregate as including Weinberger's $1 million excess policies. In addition to the above reasons, however, this argument fails because each of Weinberger's Certificates of Insurance expressly states that his policies' annual aggregate limits of liability are $750,000, directly indicating that these excess policies did not fall within the

---

[2] The Fund's argument that liability should be allocated to the insurers because they have greater ability to individually assess the risk of their insureds, whereas the Fund allocates risk across physicians in a specialty class, strikes the Court more as a critique of the Act itself than as a basis to deviate from interpreting it according to its plain language.

ambit of § 34-18-4-1 and the definition of annual aggregate. [DE 170-1 p. 17, 170-2 p. 9, 170-3 p. 12, 170-4 p. 16]. In sum, the Fund has not presented any argument that would justify modifying the Court's determination of the aggregate policy limits that apply to Weinberger's malpractice, so its motion for reconsideration is DENIED.

**C.      Motion to Certify Question to the Indiana Supreme Court**

The Fund finally requests that, in the alternative to reconsidering its ruling regarding the aggregate limits, the Court certify that question to the Indiana Supreme Court. [DE 603]. This motion has also been fully briefed. [DE 610, 616]. Indiana Rule of Appellate Procedure 64(a) permits federal courts to certify to the Indiana Supreme Court "an issue of state law that is determinative of the case and on which there is no clear controlling Indiana precedent." Certification should be approached "with circumspection," but may be appropriate where "'the case concerns a matter of vital public concern, where the issue will likely recur in other cases, where resolution of the question to be certified is outcome determinative of the case, and where the state supreme court has yet to have an opportunity to [decide] . . . the issue.'" *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 378 (7th Cir. 2010) (alterations in original) (quoting *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 672 (7th Cir. 2001)).

Here, certification is inappropriate for the same reason that it was not appropriate to enter final judgment on this issue: it is not dispositive, at least not yet. Determining the aggregate limits served several purposes in this case. First, if Medical Assurance paid up to those limits through settlements or by paying judgments entered against its insureds, then the dispute as to whether it owed coverage under the policies would be moot, and the case would be resolved. Second, the aggregate limits would represent the damages for which Medical Assurance would be liable if it loses its declaratory judgment action, meaning the damages phase essentially preceded the liability phase in this case. Certain of the parties believed that resolving that

8

uncertainty now would foster the resolution of this action through settlement. [DE 558]. At this point, however, Medical Assurance has not paid out up to its policy limits, Medical Assurance's liability has not been established, and the parties have not reached a settlement, so this action will remain pending regardless of the resolution of the amount of aggregate limits. It is also possible that Medical Assurance will prevail in establishing that it does not owe coverage for these claims in the first place, in which case the amount of aggregate limits would be immaterial.

Declining to certify this issue to the Indiana Supreme Court at this juncture does not mean that this question, which the Court acknowledges is an important question of Indiana state law, will evade consideration by the Indiana Supreme Court. The Seventh Circuit Court of Appeals has the same ability as this Court to certify a question to the Indiana Supreme Court, Ind. R. App. P. 64(a), Seventh Cir. R. 52, and if it resolves the many issues at play in this case such that the amount of aggregate limits becomes dispositive, then it can certify this question if it sees fit. However, since this question is not dispositive at this stage of litigation, the Fund's motion to certify is DENIED.

**D.     Conclusion**

Medical Assurance's motion to dismiss [DE 572], the Fund's motion to reconsider [DE 601], and the Fund's motion in the alternative to certify a question to the Indiana Supreme Court [DE 603] are each DENIED.

SO ORDERED.

ENTERED:  June 10, 2014

　　　　　　　　　　　　　　　　　　/s/ JON E. DEGUILIO
　　　　　　　　　　　　　　　　Judge
　　　　　　　　　　　　　　　　United States District Court